1  Tarek H. Zohdy (SBN 247775)
   Tarek.Zohdy@capstonelawyers.com
2  Cody R. Padgett (SBN 275553)
   Cody.Padgett@capstonelawyers.com
3  Laura E. Goolsby (SBN 321721)
   Laura.Goolsby@capstonelawyers.com
4  CAPSTONE LAW APC
   1875 Century Park East, Suite 1000
5  Los Angeles, California 90067
   Telephone:  (310) 556-4811
6  Facsimile:  (310) 943-0396

7  Attorneys for Plaintiffs

8                  UNITED STATES DISTRICT COURT

9                SOUTHERN DISTRICT OF CALIFORNIA

10

11  BRADLEY CARICOFE, SHAWN          Case No.:  **'23 CV 1012 TWR AHG**
    THIBODEAUX, JULIE
12  THIBODEAUX,  KENNETH             **CLASS ACTION COMPLAINT
    HUNNEL, AND LEANNE               FOR:**
13  HUNNEL, individually, and on
    behalf of a class of similarly situated   (1) Violation of California's
14  individuals,                          Consumer Legal Remedies Act
                                          ("CLRA")
15           Plaintiffs,              (2) Violation of California's Unfair
                                          Competition Law
16       v.                          (3) Breach of Express Warranty under
                                          California Law
17                                    (4) Breach of Implied Warranty under
    FORD MOTOR COMPANY, a                 the Song-Beverly Consumer
18  Delaware corporation,                 Warranty Act
                                      (5) Breach of Implied Warranty under
19           Defendant.                  California Law
                                      (6) Breach of Express Warranty under
20                                        Maryland Law
                                      (7) Breach of Implied Warranty under
21                                        Maryland Law
                                      (8) Violations of the Maryland
22                                        Consumer Protection Act
                                      (9) Breach of Express Warranty (Tex.
23                                        Bus. & Com. Code §§ 2.313 &
                                          2A.210)
24                                    (10) Breach of The Implied Warranty
                                          of Merchantability (Tex. Bus. &
25                                        Com. Code §§ 2.314 and 2A.212)
                                      (11) Violations of the Texas
26                                        Deceptive Trade Practices Act –
                                          Consumer Protection Act, (Texas
27                                        Bus. & Com. Code § 17.41, *et
                                          seq.*)
28

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(12) Breach of Express Warranty under the Magnuson-Moss Warranty Act

(13) Breach of Implied Warranty under the Magnuson-Moss Warranty Act

(14) Fraudulent Concealment/Omission

(15) Unjust Enrichment

**DEMAND FOR JURY TRIAL**

1.     Plaintiffs Bradley Caricofe, Shawn Thibodeaux, Julie Thibodeaux, Kenneth Hunnel, and Leanne Hunnel ("Plaintiffs"), bring this Complaint individually and on behalf of all persons in the United States who purchased or leased any 2020-present Ford Explorer 2.3L or 3.0L ST vehicle equipped with a rear subframe assembly attached to the vehicle via only one rear axle horizontal mounting bolt ("Class Vehicles" or "Vehicles").

2.     Defendant Ford Motor Company ("Ford" or "Defendant") designed, manufactured, marketed, distributed, sold, warranted, and/or serviced the Class Vehicles. Plaintiffs allege as follows:

### INTRODUCTION

3.     This is a consumer class action concerning a failure to disclose material facts and a safety concern to consumers.

4.     Defendant manufactured, marketed, distributed, and/or sold the Class Vehicles without disclosing that the Class Vehicles' rear subframe assemblies were defective.

5.     Specifically, Plaintiffs allege that the rear subframe assemblies are defective in that their design, workmanship, manufacturing, and/or installation can cause the rear axle horizontal mounting bolt to fracture, which in turn will result in the eventual sudden and violent disconnection of the rear driveshaft assembly or its component parts, often while the vehicle is in motion (the "Rear Subframe Defect"). When the rear subframe assembly bolt fails while a Class Vehicle is being driven, the rear differential suddenly drops, which can lead to the unexpected destruction of a broad array of suspension, driveshaft assembly, and exhaust system components. This sudden failure can result in a total loss of control of the Class Vehicle while driving, as well as a drastically increased risk of collision due to the driver's inability to maintain steering, braking, and speed control, thereby putting consumers, passengers, and bystanders in danger. As further described below, discovery will show that defectively designed,

manufactured, and/or installed rear subframe assemblies result in these failures.

6.     The Rear Subframe Defect presents a significant safety hazard. If the rear axle horizontal mounting bolt fractures, drivers are unable maintain steering, braking, and speed control. The Rear Subframe Defect endangers drivers, pedestrians, and other vehicles because it makes accidents wherein the vehicle strikes a person, animal, or object in the roadway more likely, and sometimes entirely unavoidable, due to the loss of control experienced by the driver as a result. For this reason, Class Members have consistently reported fear of driving their Class Vehicles.

7.     Defendant sold the Class Vehicles with a 3-year/36,000-mile New Vehicle Limited Warranty ("NVLW") that purports to cover the rear subframe assemblies. However, owners and lessees have often complained that their Rear Subframe assemblies requiring repair or replacement are refused a sufficient repair, even when within the warranty period. This is evidenced through Class Member complaints to the National Highway Traffic Safety Administration ("NHTSA"), which demonstrate that Defendant's authorized dealerships are repairing Rear Subframe assemblies with ineffective software updates.

8.     The Rear Subframe Defect is inherent in each Class Vehicle and was present at the time of sale or lease.

9.     Defendant was aware in at least 2019, and likely several years prior, that the Class Vehicles required a four bolt rear subframe assembly (with two rear axle mounting bolts) as evidenced by its presale design and testing of the newly re-designed 2020 Ford Explorer ST, the specs for which—tested and designed by Ford itself—required the four bolt rear subframe assembly (with two rear axle mounting bolts) on all higher horsepower and torque-rated vehicles, *i.e.* the Class Vehicles. Ultimately, Ford implemented the four bolt subframe in only a small subset of the 2020 Ford Explorer STs with higher horsepower and torque ratings, the rollout for which immediately preceded the Class Vehicles. On information

and belief, Ford willfully substituted the unsafe rear subframe assembly (with one rear axle mounting bolt) for the safer-as-designed four bolt assembly due to supply chain issues beginning in 2020 as a result of the Covid-19 pandemic.

10. Accordingly, discovery will show that, since the beginning of 2020, Defendant has known that the Class Vehicles' rear subframe assemblies were defective and would need frequent repair, prematurely fail, require frequent replacement, including replacements just outside of warranty, that the replacement rear subframe assemblies installed would be equally as defective as the originals, and that the rear subframe assemblies would cause the symptoms of the Rear Subframe Defect described above (rear axle horizontal mounting bolt fracturing or otherwise failing, the driveshaft disconnecting; the rear differential dropping; various components such as suspension, driveshaft assembly, and exhaust system failing) yet Defendant continued to equip the Class Vehicles with defective rear subframe assemblies. Moreover, Defendant not only refused to disclose the alleged Rear Subframe Defect to consumers, they also actively concealed, and continue to conceal, their knowledge concerning the Rear Subframe Defect.

11. Defendant undertook affirmative measures to conceal rear subframe assembly failures and other malfunctions through, *inter alia*, Technical Service Bulletins ("TSB") issued to authorized repair facilities only and not provided to owners or lessees.

12. Defendant had superior and/or exclusive knowledge of material facts regarding the Rear Subframe Defect due to its pre-production testing, design failure mode analysis, aggregate part sales, consumer complaints about the Rear Subframe Defect to Defendant's dealers--who are its agents for vehicle repairs--customer complaints made directly to Ford, dealer audits, aggregate warranty information, consumer complaints to, and resulting notice from, NHTSA, early consumer complaints on websites and internet forums, dealership repair orders, among other internal sources of information about the problem.

13. The Rear Subframe Defect is material because, *inter alia,* it poses a safety concern. As attested by Class Members in complaints to the National Highway Traffic Safety Administration ("NHTSA"), and to other online forums, the rear axle horizontal mounting bolt can suddenly fail, causing total loss of control of the Class Vehicle while driving, including the inability to maintain steering, braking, speed control, and responsiveness to safety threats, as well as greatly increased risk of collision.

14. Defendant's failure to disclose the Rear Subframe Defect has caused Plaintiffs and putative class members to lose the use of their vehicles and/or incur costly repairs that have conferred an unjust substantial benefit upon Defendant.

15. Discovery will show that, in an effort to conceal the Rear Subframe Defect, Defendant has instructed dealers to tell consumers their vehicles are "operating normally" or "operating as intended" when they are not, or to give excuses for sub-par performance such as the rear subframe bolt fracturing. This is a common practice in the automotive industry. By denying the existence of a defect, manufacturers can play on the consumers' lack of technical expertise and avoid implementing potentially costly fixes for years, or at least until the vehicles are out of warranty. When remedial measures are taken, they are often through the issuance of service bulletins provided to dealers only that are narrowly crafted and underinclusive, as occurred here and set forth *infra*.

16. Had Defendant disclosed the Rear Subframe Defect, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles, would have paid less for them, or would have required Defendant to replace, or pay for the replacement of, the defective rear subframe assemblies with a non-defective version before their warranty periods expired.

### THE PARTIES

**Plaintiff Bradley Caricofe**

17.    Plaintiff Caricofe is a Virginia citizen residing in Woodbridge, Virginia.

18.    In or around August 2021, Plaintiff Caricofe purchased a new 2021 Ford Explorer ST from Waldorf Ford, an authorized Ford dealership located in Waldorf, Maryland.

19.    Plaintiff Caricofe purchased his vehicle primarily for personal, family, or household use.

20.    Safety, reliability, and quality of the vehicle and its components were important factors in Plaintiff Caricofe's decision to purchase his vehicle. Before making his purchase, Plaintiff Caricofe researched the 2021 Ford Explorer ST online, by "Googling" the vehicle and looking up crash test reports. Additionally, Plaintiff Caricofe did significant research in 2019, when purchasing the then newly designed Ford Explorer, the 2020 Ford Explorer ST. However, although the 2020 model had the correct, safe four-bolt rear subframe, thereby reinforcing his belief that the 2021 model he then purchased was safe, Plaintiff Caricofe would come to learn that was not the case.

21.    At the dealership, Plaintiff Caricofe also reviewed the vehicle's Monroney Sticker or "window sticker," which listed official information about the vehicle. Plaintiff Caricofe also discussed the safety features of the vehicle with dealership personnel, who made no reference to the Rear Subframe Defect. Plaintiff Caricofe believed that the 2021 Ford Explorer ST would be a safe and reliable vehicle.

22.    Defendant's omissions were material to Plaintiff Caricofe. Had Defendant disclosed its knowledge of the Rear Subframe Defect before he purchased his vehicle, Plaintiff Caricofe would have seen and been aware of the disclosures. Furthermore, had he known of the Rear Subframe Defect, Plaintiff

Caricofe would not have purchased his vehicle.

23.     In early 2022, Plaintiff Caricofe discovered that his Class Vehicle was built with a deficient rear subframe that is prone to failure at the bolt joining the frame and differential. Subsequently, he was advised via written correspondence from Ford, that there was a recall issued for this problem. Thereafter, in early 2023, Plaintiff Caricofe brought his vehicle to Koons Woodbridge Ford, an authorized Ford dealer located in Woodbridge, Virginia, for repair pursuant to the recall. However, the recall repair consisted only of a software update to engage the parking brake and prevent rollaway. As this repair did nothing to address the safety risk of the rear subframe failing while the Class Vehicle is in motion, Plaintiff Caricofe continues to fear or his safety. He has requested replacement of the rear subframe with a frame that is not defective from the Ford-authorized dealer multiple times but has been continually refused. Indeed, the dealership has informed Plaintiff Caricofe that Ford has no fix for this issue. Plaintiff Caricofe's rear subframe assembly continues to present a safety risk and be defective.

24.     Despite bringing his vehicle to a Ford dealership—Ford's authorized agent for repairs—Plaintiff Caricofe has not received a permanent repair under warranty, and his vehicle continues to exhibit the Rear Subframe Defect.

25.     As a result of the Rear Subframe Defect, Plaintiff Caricofe has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Caricofe will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Class Vehicle, although he would like to do so.

26.     At all times, Plaintiff Caricofe, like all Class Members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

**Plaintiffs Shawn and Julie Thibodeaux**

27.     Plaintiffs Shawn and Julie Thibodeaux ("Thibodeaux") are Texas citizens residing in Katy, Texas.

28.     In or around February 2022, Plaintiffs Thibodeaux purchased a new 2022 Ford Explorer ST from Mac Haik Ford, an authorized Ford dealership located in Houston, Texas.

29.     Plaintiffs Thibodeaux purchase their vehicle for personal, family, or household use.

30.     Safety, reliability, and quality of the vehicle and its components were important factors in Plaintiffs Thibodeaux's decision to purchase their vehicle. Before making their purchase, Plaintiffs Thibodeaux test drove a Ford Explorer ST and reviewed the Mac Haik Ford dealership website. At the dealership, Plaintiffs Thibodeaux also reviewed the vehicle's Monroney Sticker or "window sticker," which listed official information about the vehicle. Dealership personnel made no reference to the Rear Subframe Defect. Plaintiff Thibodeaux believed that the 2022 Ford Explorer ST would be a safe and reliable vehicle.

31.     Defendant's omissions were material to Plaintiffs Thibodeaux. Had Defendant disclosed its knowledge of the Rear Subframe Defect before they purchased their vehicle, Plaintiffs Thibodeaux would have seen and been aware of the disclosures. Furthermore, had they known of the Rear Subframe Defect, Plaintiffs Thibodeaux would not have purchased their vehicle.

32.     In late 2022, Plaintiffs Thibodeaux discovered that their vehicle was built with a deficient rear subframe via written correspondence from Ford that there was a recall issued for this problem. Immediately thereafter, on or around September 30, 2022, Plaintiffs brought their vehicle to Ryan Ford, an authorized Ford dealer located in Sealy, Texas, for repair pursuant to the recall. However, the recall repair consisted only of a software update to engage the parking brake and prevent rollaway. As this repair did nothing to address the safety risk of the rear

subframe failing while the Class Vehicle is in motion, Plaintiffs Thibodeaux continue to fear for their safety. Plaintiffs Thibodeaux's rear subframe assembly continues to present a safety risk and be defective.

33. Despite bringing their vehicle to a Ford dealership—Ford's authorized agent for repairs—Plaintiffs Thibodeaux have not received a permanent repair under warranty, and their vehicle continues to exhibit the Rear Subframe Defect.

34. As a result of the Rear Subframe Defect, Plaintiffs Thibodeaux have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiffs Thibodeaux will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Class Vehicle, although they would like to do so.

35. At all times, Plaintiffs Thibodeaux, like all Class Members, have driven their vehicle in a manner both foreseeable and in which it was intended to be used.

**Plaintiffs Kenneth and Leanne Hunnel**

36. Plaintiffs Kenneth and Leanne Hunnel ("Hunnel") are California citizens residing in Sun City, California.

37. In or around May 2021, Plaintiffs Hunnel purchased a new 2021 Ford Explorer ST from Ken Grody Ford, an authorized Ford dealership located in Carlsbad, California.

38. Plaintiffs Hunnel purchased their vehicle primarily for personal, family, or household use.

39. Safety, reliability, and quality of the vehicle and its components were important factors in Plaintiffs Hunnel's decision to purchase their vehicle. Before making their purchase, Plaintiffs Hunnel researched the 2021 Ford Explorer ST online, by "Googling" the vehicle and reviewing the Ford website along with

various automotive websites and forums. At the dealership, Plaintiffs Hunnel also reviewed the vehicle's Monroney Sticker or "window sticker," which listed official information about the vehicle. Dealership personnel made no reference to the Rear Subframe Defect. Plaintiffs Hunnel believed that the 2021 Ford Explorer ST would be a safe and reliable vehicle.

40.     Defendant's omissions were material to Plaintiffs Hunnel. Had Defendant disclosed its knowledge of the Rear Subframe Defect before they purchased their vehicle, Plaintiffs Hunnel would have seen and been aware of the disclosures. Furthermore, had they known of the Rear Subframe Defect, Plaintiffs Hunnel would not have purchased their vehicle.

41.     Around late 2021 or early 2022, Plaintiffs Hunnel brought their vehicle to an authorized Ford dealer (Lake Elsinore Ford in Lake Elsinore, California) for repair pursuant to the Rear Subframe Defect recall. However, the recall repair consisted only of a software update to engage the parking brake and prevent rollaway. As this repair did nothing to address the safety risk of the rear subframe failing while the Class Vehicle is in motion, Plaintiffs Hunnel continue to fear for their safety. Plaintiff Ken Hunnel has requested replacement of the rear subframe with a frame that is not defective from the Ford-authorized dealer but dealership personnel have told them that they are not authorized to replace the rear subframe. Plaintiffs Hunnel's rear subframe assembly continues to present a safety risk and be defective.

42.     Despite bringing their vehicle to a Ford dealership—Ford's authorized agent for repairs—Plaintiffs Hunnel have not received a permanent repair under warranty, and their vehicle continues to exhibit the Rear Subframe Defect.

43.     As a result of the Rear Subframe Defect, Plaintiffs Hunnel have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiffs Hunnel will

be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Class Vehicle, although they would like to do so.

44.    At all times, Plaintiffs Hunnel, like all Class Members, have driven their vehicle in a manner both foreseeable and in which it was intended to be used.

**Defendant Ford Motor Company**

45.    Defendant Ford Motor Company is a corporation organized and in existence under the laws of the State of Delaware and registered to do business in the states of Delaware, California, Maryland and Virginia. Ford is headquartered in Dearborn, Michigan.

46.    Ford is responsible for manufacturing, sales, marketing, service, distribution, import, and export of Ford branded products, including vehicles and parts, in the United States. Ford is also the warrantor and distributor of Ford vehicles, including the Class Vehicles, throughout the United States.

47.    In order to sell vehicles to the general public, Ford enters into agreements with authorized dealerships who engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new Ford-branded vehicles, authorized dealerships are also permitted to service and repair these vehicles under the warranties Ford provides directly to consumers who purchased new vehicles from the authorized dealerships. All service and repair at an authorized dealership is completed according to Ford instructions, issued through service manuals, TSBs, and other documents. Per the agreements between Ford and the authorized dealers, consumers such Plaintiffs are able to receive services under Ford's issued warranty at dealer locations that are convenient to them. These agreements provide Ford with a significant amount of control over the actions of the authorized dealerships. For example, on information and belief, Ford employees are appointed as managers for particular regions of the United States and their responsibilities include managing the day-to-day operations of the

dealerships located within their regions.

48.     Discovery will show that Ford also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional material relating to the Class Vehicles.

## JURISDICTION

49.     This is a class action.

50.     Members of the proposed Class number more than 100 and at least one plaintiff and one defendant are citizens of different states.

51.     There are at least 100 members in the proposed class, and the aggregate claims of individual Class Members exceed $5,000,000.00 in value, exclusive of interest and costs.

52.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d).

53.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to this Court's jurisdiction. This Court has personal jurisdiction over Defendant because Ford conducts substantial business in this District and discovery will show that significant conduct involving Defendant giving rise to the Complaint took place in this District.

## VENUE

54.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the conduct giving rise to this lawsuit occurred here and Defendant is subject to personal jurisdiction here by conducting business within the State of California. Plaintiffs' counsel's Declaration of Venue, to the extent required under California Civil Code section 1780(d), is attached hereto as **Exhibit 1**.

## FACTUAL ALLEGATIONS

55.     Defendant designed, manufactured, distributed, marketed, sold, and/or leased the Class Vehicles. Defendant sold, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles in California and nationwide. Defendant warrants and services the Class Vehicles through their

nationwide network of authorized dealers and service providers.

56.    Defendant provided all purchasers or lessees of the Class Vehicles with the NVLW. The terms of this warranty are non-negotiable and Defendant exercises sole authority in determining whether and to what extent a particular repair is covered under the warranties it offers.

57.    The NVLW provided by Ford includes basic bumper to bumper warranty coverage, and states, in relevant part:

> Your NEW VEHICLE LIMITED WARRANTY gives you specific legal rights. You may have other rights that vary from state to state. Under your New Vehicle Limited Warranty if:
>
> - your Ford vehicle is properly operated and maintained, and
>
> - was taken to a Ford dealership for a warranted repair during the warranty period,
>
> then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.

58.    The subframe is the structure below the frame that supports the axle, suspension, and powertrain. The subframe performs a critical role in the stability and the ride quality which are central to vehicle dynamics and safety. "The subframe is a critical element between the road loads and the passenger compartment. It acts as a mount structure for the suspension and it reacts to vehicle travel on corners, on bumps, and acceleration and braking."[1]

59.    In 2020, Ford released an all-new performance-oriented trim of its popular Ford Explorer SUV, the 2020 Ford Explorer ST. The Ford Explorer ST was a ground-up redesign from the base Ford Explorer, including body, chassis, and motor changes. Specifically, the rear subframe in the Ford Explorer ST was

---

[1]   Aluminum Extruders Council, "Subframes & Engine Cradles" available at: https://aec.org/page/subframes-engine-cradles#:~:text=The%20subframe%20is%20the%20structure,axle%2C%20suspension%2C%20and%20powertrain (last accessed, Mar. 8, 2023)

designed to be connected to the rear differential using four bolts, including two rear axle horizontal mounting bolts. Meanwhile, the base Ford Explorer and some other trims of the Ford Explorer have a similar subframe assembly that is held with three bolts, which includes only one rear axle horizontal mounting bolt, due to its lower horsepower and torque rating. Figures One and Two below depict the four-bolt assembly with the two rear axle horizontal mounting bolts. Figures Three and Four below depict the three-bolt assembly with the one rear axle mounting bolt.



Fig. 1 – Rear Subframe Assembly with Two Rear Axle Mounting Bolts

Fig. 2 – Close Up of Two Rear Axle Mounting Bolts in Fig. 1, as

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Attached to Vehicle



Fig. 3 – Rear Subframe Assembly with One Rear Axle Mounting Bolt



Fig. 4 – Close Up of One Rear Axle Mounting Bolt in Fig. 3, as Attached to Vehicle

60.     Discovery will show that Defendant used the weaker, one rear mounting bolt rear subframe assembly for the Class Vehicles, despite the design and safety protocols put in place for the higher horsepower and torque ratings of the Class Vehicle that required a rear subframe that allowed for four bolts total, including two rear axle horizontal mounting bolts, to be used to connect it to the rear differential. The Class Vehicles' rear subframe assemblies are defective because they are insufficient to withstand the higher horsepower and torque ratings

of the Class Vehicles and, as such, are designed, manufactured, and/or installed in a manner that causes the single rear bolt to fracture and/or otherwise fail, thereby causing the rear differential to suddenly drop, which may lead to the unexpected destruction of a broad array of suspension, driveshaft assembly, and exhaust system components.

61. Discovery will show that all Class Vehicles' Rear Subframe Assemblies are designed, manufactured, and installed by Defendant in substantially the same manner.

62. Discovery will confirm that the Rear Subframe Defect in all Class Vehicles is caused by improperly designed, manufactured, and/or installed Rear Subframe Assemblies in the Class Vehicles.

63. The Rear Subframe Defect is inherent in, and the same for, all Class Vehicles.

64. Discovery will show that Defendant was aware of material facts regarding the Rear Subframe Defect, in particular as a result of pre-production testing, manufacturing quality control audits, and early post-sale complaints by consumers who purchased the Class Vehicles and experienced the Rear Subframe Defect. Despite this knowledge, Defendant failed to disclose the Rear Subframe Defect and its associated safety risk to consumers. As a result of this failure, Plaintiffs and Class Members have been damaged.

**The Rear Subframe Defect Poses an Unreasonable Safety Hazard**

65. The Rear Subframe Defect poses an unreasonable safety hazard. The Rear Subframe Defect can cause drivers to lose of control of their Class Vehicles while driving, which in turn increases the likelihood of collision with pedestrians, animals, inanimate objects, and road hazards.

66. Federal law requires automakers like Defendant to be in close contact with NHTSA regarding potential automobile defects, and imposes a legal requirement (backed by criminal penalties) compelling the confidential disclosure

of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No. 106-414, 114 Stat.1800 (2000).

67.     Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety related. *Id.* Thus, Defendant knew or should have known of the many complaints about the Rear Subframe Defect logged by NHTSA Office of Defects Investigation (ODI). The content, consistency, and disproportionate number of those complaints alerted, or should have alerted, Defendant to the Rear Subframe Defect.

68.     With respect solely to the Class Vehicles, the following are but a few examples of the many complaints concerning the Rear Subframe Defect which are available through NHTSA's website, www.safercar.gov. Many of the complaints reveal that Defendant, through its network of dealers and repair technicians, have been made aware of the Rear Subframe Defect. In addition, the complaints indicate that despite having knowledge of the Rear Subframe Defect and even armed with knowledge of the exact vehicles affected, Defendant often refused to diagnose the defect or otherwise attempt to repair it while Class Vehicles were still under warranty. (Spelling and grammar mistakes remain as found in the original):

**2020 Ford Explorer ST**

a. **DATE OF INCIDENT:** June 23, 2022

   **DATE COMPLAINT FILED:** June 23, 2022

   **NHTSA/ODI ID:** 11470689

   **SUMMARY:** The contact owns a 2020 Ford Explorer. The contact received notification of NHTSA Campaign Number: 22V255000 (Power Train) and the fix stated that the dealer would update the

electronic parking brake software but not replace the bolts. The contact was concerned that an update would not fix the issue as the failure was with the bolts. The contact had not experienced a failure. The contact stated that he called the dealer and it was confirmed that the remedy was to update the electronic parking brake software. The manufacturer was contacted and confirmed the remedy and a case was opened. The manufacturer offered no further assistance. Parts distribution disconnect.

b. **DATE OF INCIDENT:** June 17, 2022

**DATE COMPLAINT FILED:** June 17, 2022

**NHTSA/ODI ID:** 11469737

**SUMMARY:** Feedback on Manufacturer Recall Number 22S27, NHTSA Recall 22V255 Allowing Ford to reprogram the powertrain control unit (ECU) on this vehicle so that the vehicle applies the emergency brake whenever the vehicle is placed in park in order to prevent the vehicle from rolling away if/when this one bolt breaks on the rear differential is NOT sufficient. The 2020 MY Ford Explorer ST/Plantium models have two bolts attaching the rear differential to the rear subframe. The equivalent 2020-2022 Lincoln Aviator also has two bolts on this part. The issue is that Ford ran out of the correct rear subframe parts and substituted a part for a lower powered powertrain, or this was a cost cutting measure gone bad. Cross referencing Ford's own parts numbers with the VIN shows the incorrect rear subframe installed at the factory. NHTSA should require Ford to properly and securely attach the rear differential to the rear subframe of the vehicle to prevent this issue. Allowing a workaround, use of parking brake to prevent rollaway, is not ok. Additionally, the equivalent police interceptor is obtaining the correct

rear subframe as part of the manufacture defect resolution. Why wouldn't the others receive the same fix?

**2021 Ford Explorer ST**

c. **DATE OF INCIDENT:** October 3, 2022

**DATE COMPLAINT FILED:** November 9, 2022

**NHTSA/ODI ID:** 11492971

**SUMMARY:** Rear subframe bolt bushing broke. (See existing recall for the rear subframe bolt breaking). This vehicle had recall performed which actually didn't address the engineering shortfall from Ford using the wrong, lighter duty, subframe on the ST model. This subframe only has one bolt holding the rear diff to the subframe. The 2020 model had two bolts, as do all MY of the Lincoln Aviator. While Ford is fixing this under warranty, using the same subframe will not fix this issue. Result will be that the bolt may break or the bushing may fail. A broken bolt will result in the drive shaft disconnecting while driving, loss of acceleration, potential wreck from drive shaft hitting ground at speed.

d. **DATE OF INCIDENT:** August 2, 2022

**DATE COMPLAINT FILED:** October 27, 2022

**NHTSA/ODI ID:** 11491173

**SUMMARY:** Numerous times no response when pushing gas pedal no acceleration when vehicle is in electric and switching to gas.This a Hybrid vehicle. I can't let my wife drive it. No warning lights come on. The recall for rear end states if the bolt fails the drive shaft and rear axles could move out of alignment and cause an accident .....yet they refuse to replace it.

e. **DATE OF INCIDENT:** February 25, 2021

**DATE COMPLAINT FILED:** September 23, 2022

**NHTSA/ODI ID:** 11485961

**SUMMARY:** My Explorer ST has the issue of having the incorrect rear subframe for the high-performance engine with only one bolt holding the differential to the rear subframe. I have talked to all of the Ford dealerships in my area. They said that this is a problem, but Ford has not provided a solution or any timeframe to fix this major issue. Another example of Ford not caring about their customers and putting profits ahead of safety. Why did they think that they could get away with installing incorrect parts for the four-cylinder engine on a vehicle that develops substantially higher HP and torque. This is my first and last Ford product I will ever buy. Why doesn't the NHTSA force Ford to fix this potentially dangerous issue.

f.  **DATE OF INCIDENT:** August 23, 2022

**DATE COMPLAINT FILED:** August 27, 2022

**NHTSA/ODI ID:** 11481543

**SUMMARY:** I recently had the recall addressed at my local Ford dealer, Performance Ford in Randolph, NJ. Ford is only allowing dealerships to reprogram the parking break to engage whenever the vehicle is placed in park. If the axle bolt were to shear, it would disengage, allowing the vehicle to roll in park. This remedy does not adequately address the underlying issue- which was the fact that Ford's Chicago mfg facility used a part designed for the 4-cyl engine power train, not the 4 bolt design required in the Police Interceptor and Explorer ST versions. The police version will be getting the parts upgraded while consumers are left with a band-aid solution. NHTSA should force Ford to address the issue- which is an inadequate bolt configuration for the HP/Torque output of performance version Explorers. This is a safety hazard as the bolt can snap while in use,

1   disconnecting the drive axle from the rear differential.

2   **2022 Ford Explorer ST**

3   g.  **DATE OF INCIDENT:** April 19, 2022

4   **DATE COMPLAINT FILED:** April 23, 2022

5   **NHTSA/ODI ID:** 11461908

6   **SUMMARY:** This is my second submission. I will continue to
7   submit to attempt to have NHTSA find out why FORD will only offer
8   a software tweak to fix a very dangerous physical issue with all 20-
9   22 Ford Explorers. Ford provided Advance Notice 22S27 to dealers
10   dated 4/19/22 advising them to STOP delivery of any in stock
11   Explorer due to a possible bolt fracture on the rear subframe which if
12   cracked will disable the vehicle. Their "fix" is a software update that
13   will reduce power to avoid acceleration which will put stress on the
14   bolt. Ford decided to remove the second bolt from all the Explorers
15   which subsequently will put stress on the one bolt they left intact.
16   Ford needs to recall and put that bolt back on the subframe as the
17   vehicle was originally designed to have. Please, please address this
18   issue with Ford to make them fix the physical issue!

19   h.  **DATE OF INCIDENT:** April 20, 2022

20   **DATE COMPLAINT FILED:** April 20, 2022

21   **NHTSA/ODI ID:** 11461576

22   **SUMMARY:** Ford released a bulletin - 22S27- to all dealers to
23   immediately stop demo/delivery for all new Explorers in stock as of
24   4/19/22. At issue is a possibility of a fractured bolt that causes the
25   differential to separate and cause "severe vibration" rendering the
26   vehicle disabled. No fix was mentioned other than a software update
27   possibly by the end of June 22 (2d qtr). This is serious if dealers are
28   told to stop delivery! I just got mine in the beginning of April. Ford

needs to step up and address this to ALL owners and not just dealers. It appears that Ford is waiting for failure of the parts before allowing any repairs. So far, only software is mentioned which supposedly throttles the engine to avoid putting stress on the rear end. This of course does NOT address the physical issue with a fractured bolt. Apparently, Ford redesigned the differential to use only one bolt vs two they had used earlier. Please pursue this as soon as possible with Ford to make them put out an emergency recall to resolve this very serious defect in manufacturing. Normally, recalls are for something that can be addressed eventually based on reported issues. However, there have not been that many incidents. For Ford to issue this notice to dealers indicates the seriousness or expected seriousnes. Thank you for your attention!

**Customer Complaints on Third-Party Websites**

69.     Similarly, complaints posted by consumers in internet forums demonstrate that the defect is widespread and dangerous and that it can manifest without warning and/or suitable repair. The complaints also indicate Defendant's awareness of the problems with the Rear Subframe and how potentially dangerous the defect is for consumers, not only to the extent such complaints reference contact with authorized dealerships and Defendant itself, but also because Ford employs staff to monitor the perception of the brand. The following are a sample of consumer complaints (spelling and grammar mistakes remain as found in the original):

70.     On the "Ford Explorer ST Forum" group on facebook.com, a consumer of a Ford Explorer ST posted the following, along with pictures:

Heard a loud thud, some grinding and got out to take a picture, welcome to the 3 bolt club I guess. Checked and clear enough it snapped when I was turning left at a stop so thankfully was not going

fast.





71.     On the "Ford Explorer ST Forum" group on facebook.com, two consumers of Ford Explorer ST vehicles had the following exchange:

Consumer 1: Ours has broken twice within 15k miles

Consumer 2: was it replaced with the proper 4 bolt or just with the same 3 bolt one?

Consumer 1: same 3 bolt

Consumer 1: it was at the ford dealership for 45 days waiting on

1    parts

2    72.    On the "Ford Explorer ST Forum" group on facebook.com, four

3    consumers of Ford Explorer ST vehicles had the following exchange:

4        Consumer 1: So, the dealer "fixed" my differential bolt recall with a

5        computer update. Tell the computer what to do if it happens. But

6        now my emergency brake is on every time I start. Is there a way to

7        turn it off?

8        Consumer 2: Not without reprogramming…which will put strain on

9        that single diff bolt if you are parked on an incline and forget to

10       manually set it…so that will put you right back where you started.

11       Several of my dealer clients said this 'fix' still doesn't cure the

12       potential problem under hard acceleration. Ask Tyler about the

13       aftermarket reinforcement options.

14       Consumer 3: Are they ever going to fix the 1 bolt issue, with the

15       correct subframe and leave the e-brake alone?

16       Consumer 4: Dealer told me it was a bandaid until a real fix gets

17       rolled out.

18       Consumer 3: hopefully, some are saying that it must break before

19       they fix it

20   73.    On the "Ford Explorer ST Forum" group on facebook.com, a

21   consumer of a 2021 Ford Explorer ST posted the following, along with a picture:

22       I got some good news about my ST and others who have the single

23       bolt in the subframe holding the rear diff. Mine has snapped twice in

24       6800 miles. The first time they just replaced the single bolt and

25       everything else. This time they are going to replace the subframe

26       with the correct one with 2 bolt holes. So hopefully there is at least a

27       legit real fix from Ford now.

28

CLASS ACTION COMPLAINT

1



74.     On explorerst.org, a consumer of a 2021 Ford Explorer ST posted the following:

> I have a 21 ST and have only done a few mods. 5 star race tune, Borla exhaust, intercooler. I'll start off by saying I do have a heavy foot. I was leaving a red light, not in sport mode and not 100% acceleration and all of a sudden I heard a loud pop and the whole car started shacking and making crazy thud sounds. I thought I had a tire that blew out. It was similar to that sound. Needles to say it was not a tire. I broke the bolts that hold the rear diff on. The bolts were clean snapped and the noise I was hearing was my drive shaft turning but not connected to the rear end. I had it towed to Ford and they are covering the repairs under warranty. Has anyone else heard of this happening.
>
> They are replacing the whole rear end, rear right axle, drive shaft mounting bracket, etc….
>
> My ST has less than 6,000 miles on it.

**Defendant Had Superior and Exclusive Knowledge of the Rear Subframe Defect**

75.     Defendant had superior and exclusive knowledge of the Rear

Subframe Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

76.     Discovery will show that before Plaintiffs purchased their Class Vehicles, and since at least 2019, Defendant knew the Class Vehicles required the most robust four-bolt subframe assembly, and since the beginning of 2020, Defendant knew about the Rear Subframe Defect through sources not available to consumers, including pre-release testing data, early consumer complaints to Defendant and its dealers who are their agents for vehicle repairs, high failure rates and replacement part sales data, consumer complaints to NHTSA (which Defendant monitors), by developing TSBs in an effort to address the Rear Subframe Defect, and through other aggregate data from Defendant's dealers about the problem. TSBs are issued exclusively to Defendant's dealerships and service providers and are not disseminated to consumers, even if their vehicles receive services as outlined in the bulletins.

77.     Defendant is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Defendant conducts tests, including pre-sale durability testing, on incoming components, including the Rear Subframe and Rear Subframe Assembly, to verify the parts are free from defect and align with Defendant's specifications. Thus, Defendant knew or should have known the Rear Subframe was defective and prone to putting drivers in a dangerous position due to the inherent risks of the Rear Subframe Defect.

78.     Additionally, discovery will show that Defendant knew of the impact of this defect from the sheer number of reports received from dealerships. Defendant's customer relations department, which interacts with individual dealerships to identify potential common defects, has received numerous reports regarding the Defect, which led to the release of TSBs and dealer communications. Defendant's customer relations department also collects and analyzes field data

including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

79.     Defendant's warranty department similarly analyzes and collects data submitted by its dealerships to identify warranty trends in its vehicles. It is Defendant's policy that when a repair is made under warranty the dealership must provide Defendant with detailed documentation of the problem and a complete disclosure of the repairs employed to correct it. Dealerships have an incentive to provide detailed information to Defendant, because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently detailed.

80.     Ford first issued Special Service Message ("SSM") 50471 in February 2022 for Model Year ("MY") 2020-2022 Ford Explorer vehicles, advising that "[s]ome 2020-2022 Explorer vehicles may exhibit a rear axle mounting bolt that has broken." Ford explained that, "[i]n order to correct the condition, the rear subframe, differential cover, and mounting bolts will need to be replaced in addition to any other damaged components."

81.     On April 14, 2022, Ford issued a Safety Recall Report (Manufacturer Recall No. 22S27) recalling 2020-2022 Ford Explorer 2.3L RWD / 3.0L PHEV / 3.3 L FHEV Retail / 3.0L ST gas vehicles (along with two types of Ford Explorer police vehicles that are not sold to the general public and are not a part of this complaint). The Safety Recall Report ("Recall") explained that the affected vehicles are "equipped with suspect rear axle bolts and and [sic] an older version of Electronic Park Brake Software."

82.     The Recall described the defect as follows:

Affected vehicles were built with a 3-point mounted axle design. On some units the rear axle horizontal mounting bolt may fracture. Powertrain torque through the driveline causes axle rotation of the pinion angled towards the subframe, which exerts a bending force on the rear axle bolt. Peak torque is normally experienced during a launch event. After numerous peak torque events are experienced, the bolt may suffer a fatigue failure, which will lead to the axle housing moving

1
2

out of position, resulting in a condition described by customers and dealer technicians variably as loud, grinding, binding, or clunking noises.

3
4
5
6
7
8

83.    The Recall describes the safety risk of this defect as follows: If the rear axle bolt breaks, the driveshaft/half shafts may become disconnected, resulting in loss of transmission torque to the rear wheels which is necessary to hold the vehicle in park. If the parking brake is not applied, the loss of the primary park torque will allow the vehicle to roll in park increasing the risk of crash and injury." The the above-described issue occurs without warning ("Identification of Any Warning that can Occur: NA"). The Remedy Program initiated as part of the recall merely instructs affected vehicle owners to "take their vehicle to a Ford or Lincoln dealer to have the PCM software updated to engage the Electronic Park Brake when Park is commanded."

9
10
11
12
13
14

84.    In June 2022, Ford began Customer Satisfaction Program 22N06, which provided a "one-time repair (if needed) to the parts required to replace a rear subframe bushing and axle cover due to a rear axle bolt bending and fracturing for ten (10) years of service or 150,000 miles from the warranty start date of the vehicle, whichever occurs first."

15
16
17
18
19
20
21
22
23
24
25
26
27
28

85.    On April 19, 2022, Ford issued a Delivery Hold to all U.S. Ford and Lincoln Dealers pursuant to the Recall that stated, "[i]n some of the affected vehicles, the rear axle mounting bolt may fracture during vehicle acceleration. A fractured rear axle bolt will allow the rear axle housing to move out of position, resulting in severe noise and vibration." If the driveshaft/half shafts become disconnected and there is loss of transmission torque to the rear wheels, there could be a consequential loss of power while the vehicle is being driven. The driver could also lose complete control of the vehicle. This vastly increases the risk of safety hazards, including collisions. In such cases, a software update that engages the Electronic Parking Brake when in Park does nothing to remedy the defect, and a one-time repair that is only provided once the bolt has already fractured requires consumers to brave the safety risks before an adequate remedy is provided under warranty. Discovery will show that the problem persists despite Ford's software update Recall, as a result of the Defect as described herein.

86.     The Recall also included a Chronology of Defect/Noncompliance Determination (the "Chronology"). Per the Chronology, Ford was undeniably aware of the Rear Subframe Defect as early as August 2021 when it reviewed warranty claims.

87.     However, Ford was aware in at least 2019, and likely several years before, that the Class Vehicles required the four bolt rear subframe assembly (with two rear axle mounting bolts) as evidenced by its presale design and testing of the newly re-designed 2020 Ford Explorer ST, the specs for which—researched and created by Ford itself—required the four bolt rear subframe assembly (with two rear axle mounting bolts) on all higher horsepower and torque-rated vehicles, *i.e.* the Class Vehicles. Ultimately, Ford implemented the four bolt subframe in only a small subset of the 2020 Ford Explorer STs with higher horsepower and torque ratings, the rollout for which immediately preceded the Class Vehicles. On information and belief, Ford willfully substituted the unsafe rear subframe assembly (with one rear axle mounting bolt) for the safer-as-designed four bolt assembly due to supply chain issues beginning in 2020 as a result of the Covid-19 pandemic.

88.     Discovery will show that each TSB, customer satisfaction program, and service action issued by Defendant was approved by managers, directors, and/or executives at Ford. Therefore, discovery will show that Defendant's managers, directors, and/or executives knew, or should have known, about the Rear Subframe Defect, but refused to disclose the Rear Subframe Defect to prospective purchasers and owners, and/or actively concealed the Rear Subframe Defect.

89.     The existence of the Rear Subframe Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiffs and other Class Members known of the Rear Subframe Defect, they would have paid less for the Class Vehicles or would not

1    have purchased or leased them.

2        90.    Reasonable consumers, like Plaintiffs, expect that a vehicle's Rear

3    Subframe is safe, will function in a manner that will not pose a safety risk and will

4    stay securely fastened, and is free from defects. Plaintiffs and Class Members

5    further reasonably expect that Defendant will not sell or lease vehicles with known

6    safety defects, such as the Rear Subframe Defect, and will disclose any such

7    defects to its consumers when it learns of them. They did not expect Defendant to

8    conceal and fail to disclose the Rear Subframe Defect to them, and to then

9    continually deny its existence.

10            **Defendant Has Actively Concealed the Rear Subframe Defect**

11        91.    Despite their knowledge of the Rear Subframe Defect in the Class

12    Vehicles, Defendant actively concealed the existence and nature of the defect from

13    Plaintiffs and Class Members. Specifically, Defendant failed to disclose or

14    actively concealed at and after the time of purchase, lease, or repair:

15                (a)    any and all known material defects or material nonconformity

16                       of the Class Vehicles, including the defects pertaining to the

17                       Rear Subframe;

18                (b)    that the Class Vehicles, including the Rear Subframe, were not

19                       in good working order, were defective, and were not fit for their

20                       intended purposes; and

21                (c)    that the Class Vehicles and their Rear Subframes were

22                       defective, despite the fact that Defendant learned of such

23                       defects as early as 2020, if not earlier.

24        92.    Discovery will show that when consumers present their Class

25    Vehicles to an authorized Defendant's dealer for Rear Subframe repairs, rather

26    than repair the problem under warranty, Defendant's dealers either inform

27    consumers that their vehicles are functioning properly or conduct repairs that

28    merely mask the Rear Subframe Defect such as performing a software update

and/or replacing the rear subframe only once and only if the rear subframe bolt fails.

93.     Defendant has caused Plaintiffs and Class Members to expend money and/or time at their dealerships to diagnose, repair or replace the Class Vehicles' Rear Subframe and/or related components, despite Defendant's knowledge of the Rear Subframe Defect.

### Defendant Has Unjustly Retained a Substantial Benefit

94.      Discovery will show that Defendant unlawfully failed to disclose the alleged defect to induce Plaintiffs and other putative Class Members to purchase or lease the Class Vehicles.

95.     Plaintiffs further allege that Defendant thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiffs'.

96.     As discussed above, therefore, Plaintiffs allege that Defendant unlawfully induced them to purchase their Class Vehicles by concealing a material fact (the defective rear subframe) and that they would have paid less for the Class Vehicle, or not purchased it at all, had they known of the defect.

97.     Accordingly, Defendant's ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material omissions that did - and likely will continue to - deceive consumers, should be disgorged.

### The Agency Relationship regarding the Vehicle Warranties Between Defendant Ford and its Authorized Dealers

98.     In order to sell vehicles to the general public, Defendant Ford enters into agreements with its networks of authorized dealerships to engage in retail sales with consumers such as Plaintiffs while also advertising the warranties provided by Ford directly to consumers when they purchase a Ford-branded vehicle from the authorized dealership. These agreements specifically authorize the dealerships to act in Ford's stead to provide repairs under the warranties Ford provides directly to

consumers. Accordingly, discovery will show, particularly the dealership agreements between Defendant Ford and third-party dealerships, that Defendant Ford has authorized these dealerships to be its agents for the purposes of warranty repairs, including diagnosis of whether warranty repairs are required, and as such, the consumers are third-party beneficiaries of these dealership agreements because they benefit from being able to purchase and receive warranty repairs locally. Discovery will show that because Plaintiffs and members of the Class are third-party beneficiaries of the dealership agreement which create an implied warranty of merchantability of the goods being sold by these authorized dealerships, they may avail themselves of the implied warranty against Defendant. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

99.     Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of the express and implied warranties which accompany each Class Vehicle. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by Ford. These warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of the express and implied warranties, and the consumers may therefore avail themselves of those warranties.

100.   Ford issued the express warranty to Plaintiffs and the Class members. Ford also developed and disseminated the owner's manuals and warranty booklets which direct consumers to take their vehicles to authorized dealerships for diagnosis and repair. Ford also developed and disseminated the advertisements such as vehicle brochures and television commercials, and other promotional materials relating to the Class Vehicles and promoting the terms of the warranties that they issue with the sale of each Class Vehicle. Ford is also responsible for the

content of the Monroney Stickers on its vehicles. Because Ford issues the express warranties directly to the consumers, the consumers are in direct privity with Ford with respect to the warranties.

101.    In promoting, selling, and repairing their defective vehicles, Defendant acts through numerous authorized dealers who act as, and represent themselves to the public as exclusive Ford representatives and agents, particularly for the purpose of providing repairs that are the responsibility of Ford to provide under its warranties. That the dealers act as Defendant's agents for this purpose is demonstrated by the following facts:

(a)    The authorized dealerships complete all service and repair according to instructions disseminated directly to them by Ford, including service manuals, technical service bulletins ("TSBs"), technical tips ("TT"), and other documents drafted by Ford;

(b)    Technicians at Defendant's dealerships are required to go to at least yearly Ford-given trainings in order to remain certified to work on Ford-branded vehicles, at which they receive training on proprietary systems, which provides guided, step-by-step instructions on diagnosing and repairing Ford-branded vehicles;

(c)    Consumers are able to receive services under Ford's issued New Vehicle Limited Warranties only at authorized dealerships, and they are able to receive these services because of the agreements between Ford and the authorized dealers. These agreements provide Ford with a significant amount of control over the actions of the authorized dealerships;

(d)    The warranties provided by Ford for the defective vehicles direct consumers to take their vehicles to authorized

dealerships for repairs or services;

(e) Ford controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with Ford's authorization;

(f) Ford has entered into agreements and understandings with their authorized dealers pursuant to which they authorize and exercise substantial control over the operations of their dealers and the dealers' interaction with the public, particularly the advertising of the Class Vehicles, specifically the terms and conditions of the express warranties, as well as how consumers may avail themselves of the remedies under those express warranties; and

(g) Ford implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized Ford dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs cited herein.

102. Indeed, Ford warranty booklet makes it abundantly clear that only its authorized dealerships are its agents for warranty service. The booklets, which are plainly written for the consumers, not the dealerships, tell consumers that to obtain warranty service, the Ford vehicle must be "taken to a Ford dealership for a warranted repair during the warranty period." (Ford Warranty).

103. Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of Defendant for the purposes of the warranties, which are direct contracts between Ford and the purchasers of their branded vehicles. Plaintiffs and each of the members of the Class have had sufficient direct dealings with either Ford or their agent dealerships to establish privity of contract between Ford, on one hand, and Plaintiffs and each of the members of the Class, on the other

hand. This establishes privity with respect to the express and implied warranty between Plaintiffs and Defendant. It also establishes that Plaintiffs were dealing with Defendant through their authorized agent dealerships when they were given the New Vehicle Limited Warranty associated with their vehicles, without any ability to negotiate the terms of that Warranty.

### Defendant's Warranties were Unconscionable

104.   Plaintiffs signed contracts for sale with Defendant's authorized dealers, and with that sale, were presented with a separate Warranty as drafted by Ford.  While Plaintiffs have some ability to negotiate price of the vehicle, they have no ability to negotiate the terms of the Warranty. Plaintiffs had no bargaining power with respect to the Warranty, were presented with it as a *fait accompli*, and had to accept it in the exact form in which it was presented to them, which occurred after the vehicle purchase transaction was completed. Plaintiffs had no meaningful choice regarding any aspect of the Warranty or its terms, including durational limitations of time and mileage. The terms of the warranty unreasonably favored Ford over Plaintiffs and the members of the Class; a gross disparity in bargaining power existed as between Ford and Class members; and Ford knew or should have known that the Rear Subframe Defect would manifest in the Class Vehicles both before and after the Warranty, thereby rendering the time and mileage limitations insufficient, inadequate, and unconscionable.

105.   Ford drafted the terms of the Warranty in part by using its exclusive, superior knowledge of the existence and likely manifestation of the Rear Subframe Defect. Plaintiffs and Class Members were entirely ignorant of the Rear Subframe Defect when purchasing their Vehicles and when presented with the Warranty. Plaintiffs' acceptance of the Warranty and its terms, including any disclaimers or durational limits, was neither knowing nor voluntary. Ford knew or should have known at the time of sale that the Class Vehicles were defective and would fail prematurely solely because of a defect in design, materials, and workmanship, to

wit, the Rear Subframe Defect. Plaintiffs and Class Members, on the other hand, had no notice of or ability to detect the Rear Subframe Defect prior to purchasing the Class Vehicles. For this reason, the terms of the Warranty unreasonably favored Ford over Plaintiffs and Class Members, and Plaintiffs' and Class Members' acceptance of the Warranty's durational limitations, to the extent they are found to apply so as to exclude instances where the Rear Subframe Defect manifested outside of them, was neither knowing nor voluntary, thereby rendering such limitation unconscionable and ineffective.

106. Defendant's exclusive superior knowledge of the existence of the Rear Subframe Defect and when it would manifest influenced its analysis of the Rear Subframe Defect and whether it should pay for a recall (*i.e.,* if a defect is more likely to manifest within the durational limits, a recall is only fractionally more expensive than warranty repairs; if it is more likely to manifest outside those limits, a recall is exponentially more expensive than warranty repairs.)

107. Plaintiffs were also not aware and could not have been aware that Ford would willfully not inform them of the Rear Subframe Defect which affects the safety of their vehicles and that the Rear Subframe Defect could manifest outside of the durational limit of the Warranty, despite Defendant's knowledge of this. *See Carlson v. Gen. Motors Corp.*, 883 F.2d 287 (4th Cir. 1989), cert. denied, 495 U.S. 904 (1990) (""proof that GM knew of and failed to disclose major, inherent product defects would obviously suggest that its imposition of the challenged 'durational limitations' on implied warranties constituted 'overreaching,' and that the disclaimers themselves were therefore 'unconscionable.'")

## TOLLING OF THE STATUTES OF LIMITATIONS

108. Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the Rear Subframe Defect and misrepresentations and omissions alleged herein. Through no fault or lack of

1   diligence, Plaintiffs and members of the Class were deceived regarding the Class
2   Vehicles and could not reasonably discover the Rear Subframe Defect or
3   Defendant's deception with respect to the Rear Subframe Defect. Defendant and
4   its agents continue to deny the existence and extent of the Rear Subframe Defect,
5   even when questioned by Plaintiffs and members of the Class. Instead, Defendant
6   decided to release an ineffective software update as a "recall" for the Rear
7   Subframe Defect.

8       109.   Plaintiffs and members of the Class did not discover and did not know
9   of any facts that would have caused a reasonable person to suspect that Defendant
10  was concealing a defect and/or the Class Vehicles contained the Rear Subframe
11  Defect and the corresponding safety risk. As alleged herein, the existence of the
12  Rear Subframe Defect was material to Plaintiffs and members of the Class at all
13  relevant times. Within the time period of any applicable statutes of limitations,
14  Plaintiffs and members of the Class could not have discovered through the exercise
15  of reasonable diligence the existence of the Rear Subframe Defect or that the
16  Defendant was concealing the Rear Subframe Defect.

17      110.   At all times, Defendant is and was under a continuous duty to disclose
18  to Plaintiffs and members of the Class the true standard, quality, and grade of the
19  Class Vehicles and to disclose the Rear Subframe Defect and corresponding safety
20  risk due to their exclusive and superior knowledge of the existence and extent of
21  the Rear Subframe Defect in Class Vehicles.

22      111.   Defendant knowingly, actively, and affirmatively concealed the facts
23  alleged herein. Plaintiffs and members of the Class reasonably relied on
24  Defendant's knowing, active, and affirmative concealment.

25      112.   For these reasons, all applicable statutes of limitation have been tolled
26  based on the discovery rule and Defendant's fraudulent concealment, and
27  Defendant is estopped from relying on any statutes of limitations in defense of this
28  action.

CLASS ACTION COMPLAINT

**CLASS ACTION ALLEGATIONS**

113.   Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

114.   The Class and Sub-Classes are defined as:

> **Class**:  All persons and entities in the United States who purchased or leased a Class Vehicle (the "Nationwide Class" or "Class").
>
> **California Sub-Class**:  All persons and entities who purchased or leased a Class Vehicle in the State of California.
>
> **CLRA Sub-Class**:  All members of the California Sub-Class who are "consumers" within the meaning of California Civil Code § 1761(d).
>
> **Maryland Sub-Class**:  All persons and entities who purchased or leased a Class Vehicle in the State of Maryland.
>
> **Texas Sub-Class**:  All persons and entities who purchased or leased a Class Vehicle in the State of Texas.

115.   Excluded from the Class and Sub-Classes are:  (1) Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserves the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Classes should be expanded or otherwise modified.

116.   Numerosity:  Although the exact number of Class Members is

uncertain, and can only be ascertained through appropriate discovery, the number is significant enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

117.  Typicality:  Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Defendant. The representative Plaintiffs, like all Class Members, has been damaged by Defendant's misconduct in that they have incurred or will incur the cost of repairing or replacing the defective Rear Subframe and/or its components.  Furthermore, the factual bases of Defendant's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

118.  Commonality:   There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting Class Members individually. These common legal and factual issues include the following:

       (a)    Whether Class Vehicles suffer from defects relating to the Rear Subframe;

       (b)    Whether the defects relating to the Rear Subframe constitute an unreasonable safety risk;

       (c)    Whether Defendant knew about the defects pertaining to the Rear Subframe and, if so, how long Defendant has known of the defect;

       (d)    Whether the defective nature of the Rear Subframe constitutes a material fact;

       (e)    Whether Defendant has had an ongoing duty to disclose the

1  defective nature of the Rear Subframe to Plaintiffs and Class
2  Members;

3  (f)  Whether Plaintiffs and the other Class Members are entitled to
4  equitable relief, including a preliminary and/or a permanent
5  injunction;

6  (g)  Whether Defendant knew or reasonably should have known of
7  the defects pertaining to the Rear Subframe before it sold and
8  leased Class Vehicles to Class Members;

9  (h)  Whether Defendant should be declared financially responsible
10  for notifying the Class Members of problems with the Class
11  Vehicles and for the costs and expenses of repairing and
12  replacing the defective Rear Subframe and/or its components;

13  (i)  Whether Defendant is obligated to inform Class Members of
14  their right to seek reimbursement for having paid to diagnose,
15  repair, or replace their defective Rear Subframe and/or its
16  components;

17  (j)  whether Ford's representations and omissions about the true
18  defective nature of the Class Vehicles were likely to mislead or
19  deceive, and therefore fraudulent, within the meaning of
20  California's Unfair Competition Law ("UCL");

21  (k)  Whether Ford's representations and omissions about the true
22  defective nature of the Class Vehicles were and are unfair
23  within the meaning of the UCL;

24  (l)  Whether Defendant breached the implied warranty of
25  merchantability under California law;

26  (m)  Whether Defendant breached the implied warranty of
27  merchantability under Maryland law;

28  (n)  Whether Defendant breached their express warranties under

CLASS ACTION COMPLAINT

1    Maryland Law;

2    (o)    Whether Defendant breached the implied warranty of

3            merchantability pursuant to the Magnuson-Moss Warranty

4            Act; and

5    (p)    Whether Defendant breached express warranties pursuant to

6            the Magnuson-Moss Warranty Act.

7    119.  <u>Adequate Representation</u>:   Plaintiffs will fairly and adequately

8    protect the interests of the Class Members. Plaintiffs has retained attorneys

9    experienced in the prosecution of class actions, including consumer and product

10   defect class actions, and Plaintiffs intend to vigorously prosecute this action.

11   120.  <u>Predominance and Superiority</u>:   Plaintiffs and Class Members have

12   all suffered, and will continue to suffer, harm and damages as a result of

13   Defendant's unlawful and wrongful conduct. A class action is superior to other

14   available methods for the fair and efficient adjudication of the controversy. Absent

15   a class action, most Class Members would likely find the cost of litigating their

16   claims prohibitively high and would therefore have no effective remedy. Because

17   of the relatively small size of the individual Class Members' claims, it is likely

18   that only a few Class Members could afford to seek legal redress for Defendant's

19   misconduct. Absent a class action, Class Members will continue to incur damages,

20   and Defendant's misconduct will continue unabated without remedy or relief.

21   Class treatment of common questions of law and fact would also be a superior

22   method to multiple individual actions or piecemeal litigation in that it will

23   conserve the resources of the courts and the litigants and promote consistency and

24   efficiency of adjudication.

25

26

27

28

CLASS ACTION COMPLAINT

**<u>FIRST CAUSE OF ACTION</u>**

**Violation of California's Consumer Legal Remedies Act ("CLRA"),**

**Cal Civ. Code § 1750, *et seq.***

**(On behalf of the CLRA Sub-Class)**

121.   Plaintiffs incorporate by reference each allegation set forth above.

122.   Plaintiffs Ken Hunnel and Leanne Hunnel ("California Plaintiffs") bring this cause of action individually and on behalf of the members of the CLRA Sub-Class.

123.   Ford is a "person" as defined by the CLRA. Cal. Civ. Code § 1761(c).

124.   Plaintiffs and CLRA Sub-Class Members are "consumers" within the meaning of the CLRA. Cal. Civ. Code § 1761(d).

125.   The purchase and leases of Class Vehicles by California Plaintiffs and the CLRA Sub-Class Members constitute "transactions" as defined by the CLRA. Cal. Civ. Code § 1761(e).

126.   The Class Vehicles constitute "goods" or "services" as defined by the CLRA. Cal. Civ. Code § 1761(a) and (b).

127.   California Plaintiffs and the CLRA Sub-Class Members purchased or leased the Class Vehicles primarily for personal, family, and household purposes as meant by the CLRA. Cal. Civ. Code § 1761(d).

128.   Ford's representations, active concealments, omissions, and failures to disclose regarding the Class Vehicles violated the CLRA in the following ways:

129.   Ford misrepresented the Class Vehicles had characteristics, uses, or benefits Class Vehicles did not in fact have (Cal. Civ. Code § 1770(a)(5));

130.   Ford misrepresented that the Class Vehicles were of a particular standard, quality, or grade when they were of another (Cal. Civ. Code § 1770(a)(7));

131.   Ford advertised the Class Vehicles with the intent not to sell/lease them as advertised (Cal. Civ. Code § 1770(a)(9));

132. Ford misrepresented that the Class Vehicles and the warranties conferred or involved rights, remedies, or obligations that they did not (Cal. Civ. Code§ 1770(a)(14)); and

133. Ford misrepresented that the Class Vehicles were supplied in accordance with previous representations when they were not (Cal. Civ. Code § 1770(a)(16)).

134. Ford repeatedly engaged in these unfair and deceptive acts or practices in the course of its trade or business. These acts or practices were material, capable of deceiving a substantial portion of the purchasing public, and caused economic harm to purchasers and lessees of the Class Vehicles, including the Plaintiffs.

135. By 2021, and well before the sale or lease of Class Vehicles, Ford knew or should have known about the Rear Subframe Defect affecting the Class Vehicles. Ford further knew or should have known that the Class vehicles were defectively designed or manufactured, that, as a result of this defect, the Rear Subframe bolt would repeatedly fail, and that it was not suitable for its intended use.

136. Ford had exclusive knowledge of material facts concerning the existence of the Rear Subframe Defect in the Class Vehicles, and actively concealed that defect from consumers. It did so by denying the existence of a defect to consumers—such as Plaintiffs—who contacted Ford about the failures of their Rear Subframe. Ford also concealed the Rear Subframe Defect by failing to provide an effective and permanent remedy to all of the Class Vehicles and by only providing a software update without replacing defective rear subframes and/or replacing failed Rear Subframe bolts only once when the failure already occurred.

137. Ford was under a duty to California Plaintiffs and the CLRA Sub-Class Members to disclose the defective nature of the Rear Subframes, as well as

the associated costs that would have to be repeatedly expended in order to temporarily address the failures caused by the Rear Subframe Defect, because:

138. Ford was in a superior position to know the true state of facts about the Rear Subframe Defect in the Class Vehicles;

139. California Plaintiffs and the CLRA Sub-Class Members could not reasonably have been expected to learn or discover that the Class Vehicles suffered from the Rear Subframe Defect until, at the earliest, the manifestation of the Rear Subframe Defect; and

140. Ford knew that California Plaintiffs and CLRA Sub-Class Members could not reasonably have been expected to learn or discover the Rear Subframe Defect prior to its manifestation.

141. In failing to disclose the defective nature of the Class Vehicles, Ford knowingly and intentionally concealed material facts and breached its duty not to do so.

142. The facts concealed or not disclosed by Ford to Plaintiffs and the CLRA Sub-Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase or lease a Class Vehicle. Moreover, a reasonable consumer would consider the Rear Subframe Defect to be an undesirable quality, as California Plaintiffs and the CLRA Sub-Class Members did. Had California Plaintiffs and other Class Members known that the Class Vehicles had the Rear Subframe Defect, they would not have purchased or leased a Class Vehicle or would have paid less for it.

143. California Plaintiffs and the CLRA Sub-Class Members are reasonable consumers who did not expect their Class Vehicles to contain a defective rear subframe. It is a reasonable and objective consumer expectation for consumers to expect that the rear subframe will not be mounted with an insufficient number of bolts, causing the single rear axle bolt to fracture, resulting in severe noise and vibration, sudden drop of the rear differential, sudden loss of

power, and/or destruction of a broad array of suspension, driveshaft assembly, and exhaust system components.

144.   As a result of Ford's misconduct, California Plaintiffs and C CLRA Sub-Class Members have been harmed in that the Class Vehicles contain defective rear subframes and suffer from an insufficient number of bolts, causing the single rear axle bolt to fracture, resulting in severe noise and vibration, sudden drop of the rear differential, sudden loss of power, and/or destruction of a broad array of suspension, driveshaft assembly, and exhaust system components—all of which create a grave risk of serious injury to person and property and cause Class Members to spend money to attempt to remedy the Rear Subframe Defect.

145.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, California Plaintiffs and the CLRA Sub-Class Members have suffered and will continue to suffer harm in that they have a Vehicle with a defective rear subframe and they have experienced and may continue to experience their Class Vehicles' single rear axle bolt to fracture, resulting in severe noise and vibration, sudden drop of the rear differential, sudden loss of power, and/or destruction of a broad array of suspension, driveshaft assembly, and exhaust system components, for which Ford has refused to provide and effective and permanent fix.

146.   California Plaintiffs and the CLRA Sub-Class Members seek an order enjoining Ford's unfair or deceptive acts or practices and equitable relief under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

147.   In accordance with section 1782(a) of the CLRA, Plaintiffs' counsel has served Ford with notice of its alleged violations of Cal. Civ. Code § 1770(a) relating to the Class Vehicles purchased by Plaintiffs and the CLRA Sub-Class Members and demanded that Ford, within thirty (30) days of such notice, correct or agree to correct the actions described therein and agree to reimburse associated out-of-pocket costs. If Defendant fails to provide appropriate relief for its

CLASS ACTION COMPLAINT

violations of the CLRA within 30 days, Plaintiffs will seek monetary, compensatory, and punitive damages, in addition to the injunctive and equitable relief Plaintiffs seek now.

## SECOND CAUSE OF ACTION

### Violation of California's Unfair Competition Law,

### Cal. Bus. & Prof. Code § 17200, *et seq.*

### (On behalf of the California Sub-Class)

148.   Plaintiffs incorporate by reference each allegation set forth above.

149.   California Plaintiffs bring this cause of action individually and on behalf of Class Members.

150.   California Business & Professions Code § 17200 prohibits "unfair competition" including any "unlawful, unfair, or fraudulent business practice" and "unfair, deceptive, untrue or misleading advertising." Ford engaged in conduct that violated each of this statute's three prongs.

151.   Ford committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by systematically breaching its warranty obligations and by violating the CLRA and the Song-Beverly Consumer Warranty Act as alleged above and below.

152.   Ford committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, because the acts and practices described herein, including but not limited to Ford's failure to provide a permanent remedy to fix the Rear Subframe Defect, where immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to California Plaintiffs and Class Members. Ford's acts and practices were additionally unfair because the harm to California Plaintiffs and Class Members is substantial and is not outweighed by any countervailing benefits to consumers or competition. Further, Ford's acts and practices were unfair in that they were contrary to legislatively declared or public policy.

153.   Ford committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it concealed the existence and nature of the Rear Subframe Defect, while representing in its marketing, advertising, and other broadly disseminated representations that the Class Vehicles were high quality and functional when, in fact, the Rear Subframe Defect creates a significant and material safety hazard and inhibits the quality and functionality of the Class Vehicles. Ford's representations, omissions, and active concealments about the Rear Subframe Defect are likely to mislead the public with regard to the true defective nature of Class Vehicles.

154.   Ford's unfair or deceptive acts or practices occurred repeatedly in the course of Ford's trade or business, and were likely to mislead a substantial portion of the purchasing public.

155.   California Plaintiffs relied on Ford's material representations and nondisclosures and would not have purchased/leased, or would have paid less for, the Class Vehicles had he known the truth.

156.   As a direct and proximate result of Ford's unfair, unlawful, and deceptive practices, Plain California Plaintiffs tiffs have lost money.

157.   California Plaintiffs would consider purchasing or leasing similar Ford vehicles in the future if California Plaintiffs could rely on Ford's representations regarding the vehicles.

158.   California Plaintiffs and Class Members seek an order enjoining Ford from committing such unlawful, unfair, and fraudulent business practices, and seek restitution pursuant to Cal. Bus. & Prof. Code § 17203.

### THIRD CAUSE OF ACTION

### California Breach of Express Warranty

### (On behalf of the California Sub-Class)

159.   Plaintiffs incorporate by reference each allegation set forth above.

160.   California Plaintiffs bring this cause of action individually and on

behalf of California Class Members.

161.  Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

162.  Ford provided all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford New Vehicle Limited Warranty.

163.  Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

164.  Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

165.  Ford further provides powertrain warranty coverage, which is applicable to "Rear-Wheel Drive: axle shafts, rear bearings, center support bearing, drive axle housing (including all internal parts), drive shaft, retainers, supports, seals and gaskets, universal and constant velocity joints. Four-Wheel/All-Wheel Drive: axle shafts, bearings (front and rear), center support bearing, drive shafts, final drive housing (including all internal parts), hubs-automatic front locking (four-wheel drive), locking rings (four-wheel drive), seals and gaskets, universal and constant velocity joints." This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

166.  Ford manufactured and/or installed the rear subframes and the rear subframes' component parts in the Class Vehicles, and the rear subframes and their component parts are covered by the express Warranties.

167.  The Rear Subframe Defect at issue in this litigation was present at the

time the Class Vehicles were sold or leased to California Plaintiffs and the California Sub-Class Members.

168.    As described herein, the Class Vehicles were manufactured with defective material and such defect existed at the time the Vehicles left the manufacturing plant. California Plaintiffs and Class Members submitted their Vehicles for warranty repairs as referenced herein. Ford failed to comply with the terms of the express written warranty provided to each Class member, by failing and/or refusing to repair the subject materials defect under the Vehicle's warranty as described herein.

169.    California Plaintiffs and the California Sub-Class Members relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

170.    Under the express Warranties, Ford was obligated to correct the Rear Subframe Defect in the vehicles owned or leased by California Plaintiffs and the California Sub-Class Members.

171.    Although Ford was obligated to correct the Rear Subframe Defect, none of the attempted fixes to the rear subframes are adequate under the terms of the Warranties, as they did not cure the defect.

172.    Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed California Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the rear subframes with equally defective components, without actually repairing the Class Vehicles.

173.    Ford and its agent dealers have failed and refused to conform the rear subframes to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

174.    Moreover, Ford's attempt to disclaim or limit these express

Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

175. The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect California Plaintiffs and the California Sub-Class Members. Among other things, California Plaintiffs and the California Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

176. California Plaintiffs and the California Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

177. California Plaintiffs and the California Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Rear Subframe Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the rear subframes or components thereof, and through other internal and external sources.

178. Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Rear Subframe Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Rear Subframe Defect.

179. Because Ford has not been able remedy the Rear Subframe Defect, any limitation on remedies included in the Warranties causes the Warranties to fail

their essential purposes, rendering them null and void.

180.   As a direct and proximate cause of Ford's breach, California Plaintiffs and the California Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, California Plaintiffs and the California Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

181.   As a direct and proximate result of Ford's breach of express warranties, California Plaintiffs and the California Sub-Class Members have been damaged in an amount to be determined at trial.

182.   Ford's acts in failing and/or refusing to repair the materials defect during the warranty period so as to bring the Vehicles into conformity with the express warranties, deprived California Plaintiffs and members of the Class of their rights guaranteed them under the express warranties offered by Ford.

183.   As a direct and proximate result of the willful failure of Ford to comply with its obligations under the express warranties, California Plaintiffs and members of the Class have suffered actual and consequential damages. Such damages include, but are not limited to, the cost of repairing the Vehicles, the loss of the use and enjoyment of the subject Vehicle, and a diminution in the value of the Vehicle containing the materials defects identified herein. The precise amount of these damages is unknown at the present time but is in excess of the jurisdictional limits of this Court.

### FOURTH CAUSE OF ACTION

**Breach of Implied Warranty**

**Under the Song-Beverly Consumer Warranty Act**

**Cal. Civ. Code §§ 1790, *et seq.***

**(On behalf of the California Sub-Class)**

184.   Plaintiffs incorporate by reference each allegation set forth above.

185.   California Plaintiffs bring this cause of action individually and on behalf of California Class Members.

186.   Ford's Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

187.   Ford is a manufacturer within the meaning of Cal. Civ. Code § 1791(j).

188.   California Plaintiffs and Class Members who purchased or leased their Class Vehicles within the State of California are "buyers" and "lessees" within the meaning of Cal. Civ. Code §§ 1791(b) and (h).

189.   Ford impliedly warranted to California Plaintiffs and Class Members that its Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791(a) and 1792.

190.   Ford impliedly warranted to California Plaintiffs and Class Members that it would repair or replace any defective products, including the rear subframe.

191.   The propensity of the Rear Subframe Defect to cause the single rear axle bolt to fracture, resulting in severe noise and vibration, sudden drop of the rear differential, sudden loss of power, and/or destruction of a broad array of suspension, driveshaft assembly, and exhaust system components renders the Class Vehicles to not be of the quality that a buyer or lessee would reasonably expect, and therefore not merchantable.

192.   The Rear Subframe Defect is latent and was present at the time of the sale/lease of Class Vehicles, and therefore the Vehicles were not merchantable at the time of sale/lease.

193.   The Class Vehicles do not conform to the promises and affirmations of fact made by Ford in its promotional materials and vehicle owner manuals in that the Rear Subframe Defect creates a safety hazard contrary to Ford's assurances that, among other things, it is "steadfast about safety" and that the Vehicles are "quality, comfortable, and "proof of [Ford's] commitment to safety."

194.   In violation of Cal. Civ. Code § 1791(a), Ford breached its implied warranty by selling/leasing defective Class Vehicles and refusing to permanently replace and/or repair the defective rear subframes.

195.   The Rear Subframe Defect has deprived California Plaintiffs and Class Members of the benefit of their bargain, and has caused the Class Vehicles to depreciate in value.

196.   Any attempt by Ford to limit or disclaim the implied warranties in a manner that would exclude coverage of the Rear Subframe Defect is unenforceable and void pursuant to Cal. Civ. Code §§ 1790.1, 1792.3, and 1793.

197.   As a result of Ford's breach of its implied warranties, California Plaintiffs and Class Members have been damaged in an amount to be proven at trial and are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees, pursuant to Cal. Civ. Code §§ 1794 and 1795.4.

## FIFTH CAUSE OF ACTION

### California Breach of Implied Warranty

### (On behalf of the California Sub-Class)

198.   Plaintiffs incorporate by reference each allegation set forth above.

199.   California Plaintiffs bring this cause of action individually and on behalf of California Class Members.

200.   The Class Vehicles are and were at all relevant times "goods" within the meaning of, *inter alia*, Cal. Com. Code §§ 2105(1) and 10103(a)(8).

201.   Ford is and was at all relevant times a "merchant" with respect to the Class Vehicles, under, *inter alia*, Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of the Class Vehicles, under § 2103(1)(d); and, with respect to leases, is and was at all relevant time a "lessor" of the Class Vehicles, under, *inter alia*, Cal. Com. Code § 10103(a)(16).

202.   California Plaintiffs and Class Members are "buyers" or "lessees"

within the meaning of, *inter alia*, Cal. Com. Code §§ 2103(a) and 10103(a)(14).

203.   When it sold or leased its Class Vehicles, Ford extended an implied warranty to Class Members that the Class Vehicles were merchantable and fit for the ordinary purpose for which they were sold or leased, pursuant to Cal. Com. Code §§ 2314, 10212, and 10214.

204.   Because California Plaintiffs and the California Sub-Class Members purchased their vehicles from an authorized Ford dealership, they are in privity with Defendant. Plaintiff California Plaintiffs and the California Sub-Class Members have had sufficient direct dealings with Ford and its agents for the purposes of fulfilling its responsibilities under the express warranty (dealerships and customer support personnel) to establish privity of contract between Ford, on one hand, and California Plaintiffs and the California Sub-Class Members, on the other hand.  Furthermore, Ford provided warranties directly to California Plaintiffs and the California Sub-Class Members and California Plaintiffs and the California Sub-Class Members are the intended beneficiaries of Ford's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

205.   Nonetheless, privity is not required here because California Plaintiffs and the California Sub-Class Members are the intended third-party beneficiaries of contracts between Ford and its dealerships. These contracts give the dealerships the right to sell Ford brand vehicles, as well as service and perform warranty repairs on Ford's behalf. California Plaintiffs and the California Sub-Class Members are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products Ford distributes to its authorized dealerships. California Plaintiffs and the California Sub-Class Members also have the right to receive service and warranty work at dealerships located more

conveniently to them than Ford's headquarters.

206.   California Plaintiffs and other Class Members who purchased or leased a Class Vehicle directly from Ford are entitled to the benefit of their bargain:  a Vehicle with a non-defective rear subframe that does not cause the single rear axle bolt to fracture, resulting in severe noise and vibration, sudden drop of the rear differential, sudden loss of power, and/or destruction of a broad array of suspension, driveshaft assembly, and exhaust system components.

207.   Ford breached this implied warranty in that its Class Vehicles are (1) not fit for ordinary use, and (2) not of a merchantable quality.

208.   The Rear Subframe Defect is latent and was present at the time of the sale/lease, and therefore the Vehicles were not merchantable at the time of the sale/lease.

209.   Had the Rear Subframe Defect that existed at the time of sale/lease been known, the Class Vehicles would not have been sold or leased or would not have been sold or leased at the same price for which Class Members paid.

210.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, California Plaintiffs and Class Members have been damaged in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### Breach of Express Warranty

### Md. Com. Law §§ 2-313 and 2A-210

### (On Behalf of the Maryland Sub-Class against Defendant)

211.   Plaintiffs incorporate by reference each allegation set forth above.

212.   Plaintiff Bradley Caricofe ("Maryland Plaintiff") brings this count on behalf of himself and the Maryland Sub-Class against Defendant.

213.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Md. Com. Law §§ 2-104(1) and 2A-103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

214.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Md. Com. Law § 2A-103(1)(p).

215.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Com. Law §§ 2-105(1) and 2A-103(1)(h).

216.   The rear subframes were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

217.   Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, Ford's express warranty is an express warranty under Maryland state law.

218.   Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

219.   Ford's New Vehicle Limited Warranty ("NVLW") expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

220.   Ford further provides powertrain warranty coverage, which is applicable to "Rear-Wheel Drive: axle shafts, rear bearings, center support bearing, drive axle housing (including all internal parts), drive shaft, retainers, supports, seals and gaskets, universal and constant velocity joints. Four-Wheel/All-Wheel Drive: axle shafts, bearings (front and rear), center support bearing, drive shafts, final drive housing (including all internal parts), hubs-automatic front locking (four-wheel drive), locking rings (four-wheel drive), seals and gaskets, universal and constant velocity joints." This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

221. Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Maryland Plaintiff and members of the Maryland Sub-Class purchased or leased the Class Vehicles with the defective rear subframe and/or related components.

222. Maryland Plaintiff and members of the Maryland Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Maryland Plaintiff and members of the Maryland Sub-Class that the Class Vehicles were equipped with defective rear subframes and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Rear Subframe Defect.

223. Ford breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

224. Privity is not required here because Maryland Plaintiff and members of the Maryland Sub-Class are intended third-party beneficiaries of contracts between Ford and its distributors and dealers, and specifically, of Ford's express warranties, including the NVLW, the Powertrain Warranty, and any other warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

225. Any attempt by Ford to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because Ford knowingly sold or leased defective products without informing consumers about the Rear Subframe Defect.

The time limits are unconscionable and inadequate to protect Maryland Plaintiff and the members of the Maryland Sub-Class. Among other things, Maryland Plaintiff and members of the Maryland Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by Ford and unreasonable favored Ford. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Rear Subframe Defect existed between Ford and members of the Maryland Sub-Class.

226.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Maryland Plaintiff and the members of the Maryland Sub-Class whole, because Ford has failed and/or has refused to adequately provide the promised remedies, *i.e.*, a permanent repair, within a reasonable time.

227.   Maryland Plaintiff was not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Rear Subframe Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

228.   Nonetheless, Maryland Plaintiff and members of the Maryland Sub-Class provided notice to Ford of the breach of express warranties when they took their vehicles to Ford -authorized providers of warranty repairs.

229.   As a result of Ford's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

230.   As a direct and proximate result of Defendant's breach of express warranties, Maryland Plaintiff and members of the Maryland Sub-Class have been

damaged in an amount to be determined at trial.

231. As a result of Ford's breach of the express warranty, Maryland Plaintiff and Maryland Sub-Class Members are entitled to legal and equitable relief against Ford, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## SEVENTH CAUSE OF ACTION

### Breach of the Implied Warranty of Merchantability

### Md. Com. Law §§ 2-314 and 2A-212

### (On Behalf of the Maryland Sub-Class against Defendant)

232. Plaintiffs incorporate by reference each allegation set forth above.

233. Maryland Plaintiff brings this count on behalf of himself and the Maryland Sub-Class against Defendant.

234. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Md. Com. Law §§ 2-104(1) and 2A-103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

235. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Md. Com. Law § 2A-103(1)(p).

236. The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Com. Law §§ 2-105(1) and 2A-103(1)(h).

237. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Md. Com. Law §§ 2-314 and 2A-212.

238. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Maryland Plaintiff and members of the Maryland Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to

Maryland Plaintiff and members of the Maryland Sub-Class, with no modification to the defective Class Vehicles.

239.   Ford provided Maryland Plaintiff and members of the Maryland Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their rear subframe suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

240.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

241.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Ford knew of this defect at the time these sale or lease transactions occurred.

242.   As a result of Ford's breach of the applicable implied warranties, Maryland Plaintiff and members of the Maryland Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Rear Subframe Defect, Maryland Plaintiff and members of the Maryland Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

243.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

244.   Maryland Plaintiff and members of the Maryland Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

245.   Privity is not required here because Maryland Plaintiff and members of the Maryland Sub-Class are intended third-party beneficiaries of contracts between Ford and its distributors and dealers, and specifically, of Ford's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

246.   Maryland Plaintiff and members of the Maryland Sub-Class were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of warranty would have been futile. Ford was also on notice of the Rear Subframe Defect from the complaints and service requests it received from Maryland Plaintiff and the Class Members and through other internal sources.

247.   Nonetheless, Maryland Plaintiff and members of the Maryland Sub-Class provided notice to Ford of the breach of express warranties when they took their vehicles to Ford-authorized provider of warranty repairs.

248.   As a direct and proximate cause of Ford's breach, Maryland Plaintiff and members of the Maryland Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Maryland Plaintiff and members of

the Maryland Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

249.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Maryland Plaintiff and members of the Maryland Sub-Class have been damaged in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

### Violations of the Maryland Consumer Protection Act,

### Md. Code Ann., Com. Law § 13-101, *et seq.*

### (On Behalf of the Maryland Sub-Class against Defendant)

250.   Plaintiffs incorporate by reference each allegation set forth above.

251.   Maryland Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Maryland Sub-Class.

252.   Ford, Maryland Plaintiff, and the Maryland Sub-Class Members are "persons" within the meaning of Md. Code Ann., Com. Law § 13-101(h).

253.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair and deceptive trade practice in the sale or lease of any consumer good, including representing that goods are of a particular standard, quality, or grade if they are not, advertising goods without intent to sell or lease them as advertised, selling goods knowing that a service, replacement or repair was needed, "failure to state a material fact if the failure deceives or tends to deceive," and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," Md. Code Ann., Com. Law § 13-301, regardless of whether the consumer is actually deceived or damaged, Md. Code Ann., Com. Law § 13-302. Ford engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Maryland CPA.

254.   Ford participated in unfair or deceptive trade practices that violated

the Maryland CPA. As described below and alleged throughout the Complaint, by failing to disclose the Rear Subframe Defect, by concealing the Rear Subframe Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Rear Subframe Defect in the course of its business.

255.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

256.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

257.   Ford knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

258.   Ford knew or should have known that its conduct violated the Maryland CPA.

259.   Defendant was under a duty to Maryland Plaintiff and the Maryland Sub-Class Members to disclose the defective nature of the Class Vehicles because:

260.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

261.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

262.   Defendant actively concealed the defective nature of the Class Vehicles from Maryland Plaintiff and the Maryland Sub-Class Members at the time of sale and thereafter.

263.   By failing to disclose the Rear Subframe Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

264.   The facts concealed or not disclosed by Defendant to Maryland Plaintiff and the Maryland Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's rear subframe and/or rear subframe component parts is defective, which can cause the rear axle bolt to fracture, resulting in severe noise and vibration, sudden drop of the rear differential, sudden loss of power, and/or destruction of a broad array of suspension, driveshaft assembly, and exhaust system components, is a material safety concern. Had Maryland Plaintiff and the Maryland Sub-Class Members known that the Class Vehicles suffered from the Rear Subframe Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

265.   Maryland Plaintiff and the Maryland Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Rear Subframe Defect. That is the reasonable and objective consumer expectation for vehicles.

266.   As a result of Defendant's misconduct, Maryland Plaintiff and the Maryland Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

267.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Maryland Plaintiff and the Maryland Sub-Class Members have

CLASS ACTION COMPLAINT

suffered and will continue to suffer actual damages.

268.   Ford's violations present a continuing risk to Maryland Plaintiff and the Maryland Sub-Class Members as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

269.   Maryland Plaintiff provided notice of his claims by letter dated March 6, 2023.

270.   Pursuant to Md. Code Ann., Com. Law § 13-408, Maryland Plaintiff and members of the Maryland Sub-Class seek monetary relief against Ford in the amount of actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

## NINTH CAUSE OF ACTION

### Breach of Express Warranty

### Tex. Bus. & Com. Code §§ 2.313 AND 2A.210

### (On Behalf of the Texas Sub-Class against Defendant)

271.   Plaintiffs incorporate by reference each allegation set forth above.

272.   Plaintiffs Shawn Thibodeaux and Julie Thibodeaux ("Texas Plaintiffs") bring this cause of action on behalf of themselves and on behalf of the Class against Defendant.

273.   Defendant Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

274.   With respect to leases, Defendant Ford is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

275.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

276.   The rear subframes were manufactured and/or installed in the Class Vehicles by Ford and are covered by the express warranty.

277.   Defendant Ford provided all purchasers and lessees of the Class

Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, Defendant Ford's express warranty is an express warranty under Texas state law.

278.   Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period. According to Ford, the NVLW coverage is for 3-year/36,000 miles.

279.   Defendant Ford's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Texas Plaintiffs and members of the Texas Sub-Class purchased or leased the Class Vehicles with the defective rear subframe and/or related components.

280.   Texas Plaintiffs and members of the Texas Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant Ford failed to inform Texas Plaintiffs and members of the Texas Sub-Class that the Class Vehicles were equipped with defective rear subframes and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

281.   Defendant Ford breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Ford and then failing to do so. Defendant Ford have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

282.   Texas Plaintiffs and members of the Texas Sub-Class have had sufficient direct dealings with either Defendant Ford or their agents (i.e.,

dealerships and technical support) to establish privity of contract between Defendant Ford, on one hand, and Texas Plaintiffs and each member of the Texas Sub-Class on the other hand. Nonetheless, privity is not required here because Texas Plaintiffs and members of the Texas Sub-Class are intended third-party beneficiaries of contracts between Defendant Ford and their distributors and dealers, and specifically, of Defendant Ford's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

283. Any attempt by Defendant Ford to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because Ford knowingly sold or leased defective products without informing consumers about the Defect. The time limits are unconscionable and inadequate to protect Texas Plaintiffs and the members of the Texas Sub-Class. Among other things, Texas Plaintiffs and members of the Texas Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by Defendant Ford and unreasonable favored Defendant Ford. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between Defendant Ford and members of the Texas Sub-Class.

284. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Texas Plaintiffs and the members of the Texas Sub-Class whole, because Defendant Ford have failed and/or have refused to adequately provide the promised remedies, i.e., a permanent repair, within a

1    reasonable time.

2         285.   Texas Plaintiffs were not required to notify Defendant Ford of the

3    breach because affording Defendant Ford a reasonable opportunity to cure their

4    breach of written warranty would have been futile. Defendant Ford were also on

5    notice of the Defect from the complaints and service requests it received from

6    Class Members, including those formal complaints submitted to NHTSA, and

7    through other internal sources.

8         286.   Nonetheless, Texas Plaintiffs and members of the Texas Sub-Class

9    provided notice to Defendant Ford of the breach of express warranties when they

10   took their vehicles to Ford-authorized providers of warranty repairs. Texas

11   Plaintiffs also provided notice to Defendant Ford of their breach of express

12   warranty by a letter dated April 20, 2023.

13        287.   As a result of Defendant Ford's breach of the applicable express

14   warranties, owners and/or lessees of the Class Vehicles suffered, and continue to

15   suffer, an ascertainable loss of money, property, and/or value of their Class

16   Vehicles.

17        288.   As a direct and proximate result of Defendant Ford's breach of

18   express warranties, Texas Plaintiffs and members of the Texas Sub-Class have

19   been damaged in an amount to be determined at trial.

20        289.   As a result of Defendant Ford's breach of the express warranty, Texas

21   Plaintiffs and Texas Sub-Class Members are entitled to legal and equitable relief

22   against Ford, including actual damages, specific performance, attorney's fees,

23   costs of suit, and other relief as appropriate.

24                       **TENTH CAUSE OF ACTION**

25          **Breach of The Implied Warranty of Merchantability**

26              **Tex. Bus. & Com. Code §§ 2.314 and 2A.212**

27            **(On Behalf of the Texas Sub-Class against Defendant)**

28        290.   Plaintiffs incorporate by reference each allegation set forth above.

291.   Texas Plaintiffs bring this cause of action on behalf of himself and on behalf of the Class against Defendant.

292.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

293.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

294.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

295.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Texas Bus. & Com. Code §§ 2.314 and 2A.212.

296.   Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Texas Plaintiffs and members of the Texas Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Texas Plaintiffs and members of the Texas Sub-Class, with no modification to the defective Class Vehicles.

297.   Ford provided Texas Plaintiffs and members of the Texas Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their rear subframe and related components suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

CLASS ACTION COMPLAINT

298.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

299.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Ford knew of this defect at the time these sale or lease transactions occurred.

300.   As a result of Ford's breach of the applicable implied warranties, Texas Plaintiffs and members of the Texas Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Texas Plaintiffs and members of the Texas Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

301.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

302.   Texas Plaintiffs and members of the Texas Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

303.   Texas Plaintiffs and members of the Texas Sub-Class have had sufficient direct dealings with either Ford or its agents (i.e., dealerships and technical support) to establish privity of contract between Ford, on one hand, and Texas Plaintiffs and members of the Texas Sub-Class on the other hand. Nonetheless, privity is not required here because Texas Plaintiffs and members of

the Texas Sub-Class are intended third-party beneficiaries of contracts between Ford and its distributors and dealers, and specifically, of Ford's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

304.  Texas Plaintiffs and members of the Texas Sub-Class were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of warranty would have been futile. Ford was also on notice of the Defect from the complaints and service requests it received from Texas Plaintiffs and the Class Members and through other internal sources.

305.  Nonetheless, Texas Plaintiffs and members of the Texas Sub-Class provided notice to Ford of the breach of express warranties when they took their vehicles to Ford-authorized providers of warranty repairs. Texas Plaintiffs also provided notice to Ford of its breach of express warranty by a letter dated April 20, 2023.

306.  As a direct and proximate cause of Ford's breach, Texas Plaintiffs and members of the Texas Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Texas Plaintiffs and members of the Texas Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

307.  As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Texas Plaintiffs and members of the Texas Sub-Class have been damaged in an amount to be proven at trial.

1

## ELEVENTH CAUSE OF ACTION

2
### Violations of the Texas Deceptive Trade Practices Act –
3
### Consumer Protection Act,
4
### Texas Bus. & Com. Code § 17.41, et seq.
5
### (On Behalf of the Texas Sub-Class against Defendant)

6      308.   Plaintiffs incorporate by reference each allegation set forth above.

7      309.   Texas Plaintiffs bring this cause of action on behalf of himself and on

8  behalf of the Class against Defendant.

9      310.   Ford is a "person" as that term is defined in Tex. Bus. & Com. Code

10 § 17.45(3).

11     311.   Texas Plaintiffs and the members of the Texas Sub-Class are

12 individuals, partnerships, or corporations with assets of less than $25 million (or

13 are controlled by corporations or entities with less than $25 million in assets), see

14 Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex.

15 Bus. & Com. Code § 17.45(4).

16     312.   Ford is engaged in "trade" or "commerce" or "consumer transactions"

17 within the meaning Tex. Bus. & Com. Code § 17.46(a).

18     313.   The Texas Deceptive Trade Practices – Consumer Protection Act

19 ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the

20 conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an

21 "unconscionable action or course of action," which means "an act or practice

22 which, to a consumer's detriment, takes advantage of the lack of knowledge,

23 ability, experience, or capacity of the consumer to a grossly unfair degree." Tex.

24 Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3). Ford engaged in unlawful trade

25 practices, and unfair or deceptive acts or practices that violated the Texas DTPA.

26     314.   Ford participated in unfair or deceptive trade practices that violated

27 the Texas DTPA. As described below and alleged throughout the Complaint, by

28 failing to disclose the Defect, by concealing the Defect, by marketing its vehicles

as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

315.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

316.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

317.   Ford knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

318.   Ford knew or should have known that its conduct violated the Texas DTPA.

319.   Ford was under a duty to Texas Plaintiffs and the Texas Sub-Class Members to disclose the defective nature of the Class Vehicles because:

320.   Ford was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

321.   Ford made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

322.   Ford actively concealed the defective nature of the Class Vehicles from Texas Plaintiffs and the Texas Sub-Class Members at the time of sale and

thereafter.

323.   By failing to disclose the Defect, Ford knowingly and intentionally concealed material facts and breached its duty not to do so.

324.   The facts concealed or not disclosed by Ford to Texas Plaintiffs and the Texas Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Ford's Class Vehicles, or to pay less for them. Whether a vehicle's rear subframe is defective, causing the rear axle bolt to fracture, resulting in severe noise and vibration, sudden drop of the rear differential, sudden loss of power, and/or destruction of a broad array of suspension, driveshaft assembly, and exhaust system components, is a material safety concern. Had Texas Plaintiffs and the Texas Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

325.   Texas Plaintiffs and the Texas Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

326.   As a result of Ford's misconduct, Texas Plaintiffs and the Texas Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

327.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Texas Plaintiffs and the Texas Sub-Class Members have suffered and will continue to suffer actual damages.

328.   Ford's violations present a continuing risk to Texas Plaintiffs and the Texas Sub-Class Members as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

329.   Texas Plaintiffs provided notice of their claims by a letter dated April 20, 2023.

330.   Pursuant to Tex. Bus. & Com. Code § 17.50, Texas Plaintiffs and members of the Texas Sub-Class seek an order enjoining Ford from engaging in unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

### TWELFTH CAUSE OF ACTION

**Breach of Express Warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2303 *et seq*.**

**(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes Against Defendant)**

331.   Plaintiffs incorporate by reference each allegation set forth above.

332.   Plaintiffs bring this cause of action on behalf of himself and on behalf of the Class against Defendant.

333.   Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described *infra*, which became a material part of the bargain.

334.   The rear subframe assembly and its component parts were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

335.   Ford's New Vehicle Limited Warranty ("NVLW") expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

336.   Defendant breached the express warranties by selling and leasing Class Vehicles with rear subframes that were defective, requiring repair or

replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the rear subframe and its component parts. Defendant has failed to "repair" the defects as alleged herein.

337.   Plaintiffs was not required to notify Defendant of the breach or was not required to do so because affording Defendant a reasonable opportunity to cure its breach of written warranty would have been futile. Defendant was also on notice of the defect from complaints and service requests they received from Class Members, from repairs and/or replacements of the rear subframe, and from other internal sources.

338.   Plaintiffs also provided notice to Defendant of their breach of warranty claims under the MMWA by letters dated March 6, 2023 (Plaintiff Caricofe); April 20, 2023 (Plaintiffs Shawn Thibodeaux and Julie Thibodeaux); and May 26, 2023 (Plaintiffs Ken Hunnel and Leanne Hunnel).

339.   As a direct and proximate cause of Defendant's breach, Plaintiffs and the other Class members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiffs and the other Class members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

340.   Plaintiffs and the other Class members are entitled to legal and equitable relief against Defendant, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## THIRTEENTH CAUSE OF ACTION

**(Breach of Implied Warranty under the Magnuson-Moss Warranty Act,**

**15 U.S.C. § 2303 *et seq*.)**

**(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All**

**Sub-Classes Against Defendant)**

341.   Plaintiffs incorporate by reference each allegation set forth above.

342.     Plaintiffs bring this cause of action on behalf of themselves and the Class against Defendant.

343.     The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

344.     Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

345.     Defendant is "suppliers" and "warrantors" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

346.     Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their rear subframes manufactured, supplied, distributed, and/or sold by Defendant would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their rear subframes would be fit for their intended use while the Class Vehicles were being operated.

347.     Contrary to the applicable implied warranties, the Class Vehicles and their rear subframes at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective design and materials of their rear subframes.

348.     Defendant's breach of implied warranties has deprived Plaintiffs and Class Members of the benefit of their bargain.

349.     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

350.     Defendant has been afforded a reasonable opportunity to cure their breach, including when Plaintiffs and Class members brought their vehicles in for

CLASS ACTION COMPLAINT

diagnoses and rear subframes repair.

351.   As a direct and proximate cause of Defendant's breach of implied warranties, Plaintiffs and Class Members sustained and incurred damages and other losses in an amount to be determined at trial. Defendant's conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

352.   As a result of Defendant's violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiffs and Class Members have incurred damages.

353.   Plaintiffs also provided notice to Defendant of its breach of warranty claims under the MMWA by letters dated March 6, 2023 (Plaintiff Caricofe); April 20, 2023 (Plaintiffs Shawn Thibodeaux and Julie Thibodeaux); and May 26, 2023 (Plaintiffs Ken Hunnel and Leanne Hunnel).

## FOURTEENTH CAUSE OF ACTION

### (For Fraud by Omission or Fraudulent Concealment)

### (On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes Against Defendant)

354.   Plaintiffs incorporate by reference each allegation set forth above.

355.   Plaintiffs bring this cause of action on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes against Defendant.

356.   Defendant knew that the Class Vehicles suffered from an inherent Rear Subframe Defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

357.   Defendant concealed from and failed to disclose to Plaintiffs and Class Members the defective nature of the Class Vehicles.

358.   Defendant was under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles because:

a.   Defendant was in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

b.   The omitted facts were material because they directly impact the safety of the Class Vehicles;

c.   Defendant knew the omitted facts regarding the Rear Subframe Defect were not known to or reasonably discoverable by Plaintiffs and Class Members;

d.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

e.   Defendant actively concealed the defective nature of the Class Vehicles from Plaintiffs and Class Members.

359.   The facts concealed or not disclosed by Defendant to Plaintiffs and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendant's Class Vehicles or pay a lesser price for them. Whether a vehicle's rear subframe is defective, causing the rear axle bolt to fracture, resulting in severe noise and vibration, sudden drop of the rear differential, sudden loss of power, and/or destruction of a broad array of suspension, driveshaft assembly, and exhaust system components, is a material safety concern. Had Plaintiffs and Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

360.   Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiffs and Class Members' purchase or lease of Defendant's defective Class Vehicles.

CLASS ACTION COMPLAINT

361.   Defendant continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendant continue to cover up and conceal the true nature of the problem today.

362.   As a direct and proximate result of Defendant's misconduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages. Plaintiffs and the Class reserve their right to elect either to (a) rescind their purchase or lease of the defective Vehicles and obtain restitution or (b) affirm their purchase or lease of the defective Vehicles and recover damages.

363.   Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## FIFTEENTH CAUSE OF ACTION

### (For Unjust Enrichment)

### (On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes Against Defendant)

364.   Plaintiffs incorporate by reference each allegation set forth above.

365.   Plaintiffs bring this cause of action on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes against Defendant.

366.   Defendant has received and retained a benefit from Plaintiffs and the members of the Class, and inequity has resulted.

367.   As a direct and proximate result of Defendant's failure to disclose known defects, Defendant has profited through the sale and lease of the Class Vehicles, the value of which was artificially inflated by Defendant's concealment of and omissions regarding the Rear Subframe Defect. Defendant charged higher prices for the vehicles than the vehicles' true value, and Plaintiffs and Class Members thus overpaid for the Class Vehicles. Although these vehicles are

purchased through Defendant's authorized dealers and distributors, the money from the vehicle sales flows directly back to Defendant.

368.   Additionally, as a direct and proximate result of Defendant's failure to disclose known defects in the Class Vehicles, Plaintiffs and Class Members have vehicles that require repeated, high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendant.

369.   Defendant has been unjustly enriched due to the known defects in the Class Vehicles through the use of money paid that earned interest or otherwise added to Defendant's profits when said money should have remained with Plaintiffs and Class Members.

370.   Plaintiffs and Class Members were not aware of the true facts regarding the Defect in the Class Vehicles and did not benefit from Defendant's unjust conduct.

371.   As a result of the Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

372.   Plaintiffs do not seek restitution under their unjust enrichment claim. Rather, Plaintiffs and Class Members seek non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

373.   Additionally, Plaintiffs seek injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies. Plaintiffs also seek injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class members with a replacement components that do not contain the defects alleged herein; and/or compelling Defendant to reform their warranties, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranties have been reformed. Money damages are not an adequate remedy for the above requested non-monetary

1   injunctive relief.

2                          **RELIEF REQUESTED**

3       374.   Plaintiffs, on behalf of themselves and all others similarly situated,

4   request the Court enter judgment against Defendant, as follows:

5           (a)     An order certifying the proposed Class and Sub-Classes,

6                   designating Plaintiffs as named representatives of the Class,

7                   and designating the undersigned as Class Counsel;

8           (b)     A declaration that Defendant is financially responsible for

9                   notifying all Class Members about the defective nature of the

10                  rear subframe, including the need for periodic maintenance;

11          (c)     An order enjoining Defendant from further deceptive

12                  distribution, sales, and lease practices with respect to Class

13                  Vehicles; compelling Defendant to issue a voluntary recall for

14                  the Class Vehicles pursuant to 49 U.S.C. § 30118(a);

15                  compelling Defendant to repair and eliminate the Rear

16                  Subframe Defect from every Class Vehicle; enjoining

17                  Defendant from selling the Class Vehicles with the misleading

18                  information; and/or compelling Defendant to reform its

19                  warranty, in a manner deemed to be appropriate by the Court,

20                  to cover the injury alleged and to notify all Class Members that

21                  such warranty has been reformed;

22          (d)     An award to Plaintiffs and the Class for compensatory,

23                  exemplary, and statutory damages, including interest, in an

24                  amount to be proven at trial, except that Plaintiffs are not

25                  praying for an award of monetary damages under the CLRA at

26                  this time;

27          (e)     Any and all remedies provided pursuant to the Magnuson-Moss

28                  Warranty Act;

1          (f)     Any and all remedies provided pursuant to the causes of action

2                 and statutes alleged herein;

3          (g)    A declaration that Defendant must disgorge, for the benefit of

4                 the Class, all or part of the ill-gotten profits it received from the

5                 sale or lease of the Class Vehicles or make full restitution to

6                 Plaintiffs and Class Members;

7          (h)    An award of attorneys' fees and costs, as allowed by law;

8          (i)     An award of pre-judgment and post-judgment interest, as

9                 provided by law;

10         (j)     Leave to amend the Complaint to conform to the evidence

11               produced at trial; and

12         (k)    Such other relief as may be appropriate under the

13               circumstances.

14                    **DEMAND FOR JURY TRIAL**

15        375.  Pursuant to Federal Rule of Civil Procedure 38(b) and Southern

16  District of California Local Rule 38.1, Plaintiffs hereby demand a trial by jury of

17  all issues in this action so triable.

18

19  Dated:  May 31, 2023                 Respectfully submitted,

20                                Capstone Law APC

21

22                        By: /s/ Laura E. Goolsby

23                        Tarek H. Zohdy
                               Cody R. Padgett
                               Laura E. Goolsby

24

25                        Attorneys for Plaintiffs

26

27

28